John WOODLAND, Ramdeo Jagassar, Chris Goss, and Those Similarly Situated, Plaintiffs,

v.

CITY OF HOUSTON, et al., Defendants.

Civil Action No. H–82–1076.

United States District Court, S.D. Texas, Houston Division.

Jan. 4, 1996.

Judgment and Injunction March 7, 1996.

James C. Harrington, Texas Civil Rights Project, Austin, Texas, for Plaintiffs.

John E. Fisher, Assistant City Attorney, Houston, Texas, for Defendants.

SUPPLEMENTAL FINDINGS
AND CONCLUSIONS

HUGHES, District Judge.

1. *Introduction.*

Three people challenged the intrusive questions used in polygraph tests by the City

of Houston when it screens applicants to be police and fire officers. The city's irrelevant and intrusive questioning, like asking about their sexual experiences as children, offends the constitutions of the United States and Texas. The city administered the tests irresponsibly, intruded unreasonably, flouted the law systematically, and kept no reliable records of what happened at the test, failing its responsibility as a government to conduct itself with minimal rationality and regularity.

## 2. Background.

In the early 1980s, John Woodland applied for employment with the fire department, Ramdeo Jagassar applied to the police department, and Chris Goss applied to the airport police. The City of Houston required pre-employment polygraph tests for these public safety jobs. The three applicants all "failed" the test. They sued because the City's test questions were unreasonably intrusive. After they were certified as representatives of the class of applicants, this court tried the case with an advisory jury, found for the plaintiffs, awarded damages, and issued a permanent injunction.

The court of appeals remanded the case for clarification of (a) the court's findings of fact about what questions the plaintiffs were asked and whether the questions asked were unreasonably intrusive, (b) the necessity of the class certification, and (c) propriety of injunctive relief.

## 3. Unreasonable Intrusion.

 People, even applicants for government jobs, are protected from the government's intrusion into matters that are essential to their self-actualization and unrelated to an objectively identifiable legitimate government interest. One-half of the essence of the Constitution is the structure of the government, the allocation of authority among the branches and between levels. The other half is the exclusion of the government from those aspects of individuality that the Founders wrote into the text because they are essential to a free person's thinking, learning, conferring, feeling, believing, moving, earning, and keeping—all so the individual can choose and accomplish his particular life

in liberty. "Privacy" refers in shorthand to the aspects of liberty that are impinged by governmental examination into intimate relations.

 Apart from privacy, "due process" and "equal protection," the splendid ambiguities of the Constitution, demand a relation between the governmental requirement and the legitimate governmental purpose; the strength of the relation between the means and end varies with the significance of the component of liberty affected and the state responsibility effected. To justify an exercise of power, the government must identify the interest that has been confided to it, and it must show that the imposition on the individual bears a direct and substantial relation to that legitimate interest. *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819); *see New York City Transit Auth. v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979).

 A governmental exercise of power violates an individual's right to privacy if the nature and scope of the intrusion cannot be rationally reconciled with the governmental interests. The individual's interest in avoiding disclosure of personal matters to the government can be constitutionally transcended by a legitimate, focused governmental need. *Whalen v. Roe,* 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); *Plante v. Gonzalez,* 575 F.2d 1119, 1134, 1137–38 (5th Cir.1978). As an employer, the city may not ask applicants questions that it could not reasonably have believed would elicit information to furnish it with a rational basis for discovering whether they possessed the actual qualifications reasonably required for the particular job sought. Because the intrusive questions the City of Houston actually asked bear no rational relation to a legitimate governmental interest and because they invade wholesale the individual's interest in avoiding disclosure of personal matters to the government, the city violated the United States Constitution.

The City of Houston has an interest in hiring honest, able persons for public safety jobs. As a means to that end, the city may use the polygraph, but the questions asked in

a pre-employment polygraph test must reasonably examine the applicant's present qualifications to perform the job. The city, however, asked questions of applicants for the fire, police, and airport police departments that were insulting, intrusive, argumentative, embarrassing, and wholly unrelated to its legitimate interest. The city asked questions about consensual sex, marital harmony, sex with animals, lifetime recreational drug use, non-violent criminal acts as minors, misdemeanors as adults, religious preferences, political associations, and other subjects wholly unrelated to the applicants' ability to perform the job.

This court finds that the polygraph examiners asked the plaintiffs unreasonably intrusive questions. The evidence in the record contains testimony in anguished detail from the plaintiffs matched against failures to recall or bland denials by the discreditable polygraph testers. The testers roamed through the most intimate phases of the applicants' whole lives, provoking nervousness and humiliation, with its attendant physiological responses. The injury of the test itself had an insult added when the city announced that they had "failed" the test.

Chris Goss failed the Houston polygraph tests in 1977 and 1980. During the tests he was asked about sexual behavior with animals, affairs with married women, girlfriends, cohabitation, extramarital affairs, homosexual behavior, masturbation, sexual activity as a teenager, sexual positions, thefts (including questions about money he took from his mother's purse without permission as a child), criminal behavior as a child, drug use, and intimate details of his sexual relations with his wife. None of the questions was narrowed in time.

Ramdeo Jagassar failed the Houston polygraph test in 1981. During the test he was asked about extramarital sex, masturbation in front of a mirror, homosexuality, group sex, intimate details about his sex with a girlfriend, and sex with animals. He was also asked whether he had ever contracted a venereal disease, his religious preference, marijuana use throughout his life, and the criminal history of his friends and family. None of the questions was restricted in time.

John Woodland failed the Houston polygraph test in 1980. During the test he was asked about homosexual behavior, sex with animals, indecent exposure (including whether he had "mooned" as a teenager), and indecency with children. He was also asked whether he had ever contracted a venereal disease, whether he was a member of any "radical" organizations, and whether he had taken illegal drugs in his life. None of the questions was restricted in time.

At trial, once the plaintiffs established that the intrusive questions were asked, the city failed utterly to identify a reasonable justification for its abusive intrusion into private, intimate matters essential to the person's existence but not even peripheral to the city's interest. Character is not determined by the sexual practices of friends and family, religious activity, or drug use as a teenager. Religious preference is not related to being a good public-safety officer. Misbehavior as a child has no bearing on responsibility as an adult. Legal sexual activity illustrates no employment tendency. Questions about sex with chickens, sheep, goats, and cows relate to no known aspect of policing streets or fighting fires. Questions about the applicant's non-sexual marital relations and about his family's criminal activity suggest the city's "morbid and prurient interest," not a search for loyal, efficient officers.

### 4. The Two-test Theory.

■ The city officers charged with employment screening attempted to avoid the restrictions on the scope of their interrogation by dividing the use of the polygraph into two distinct parts. First, the examiner interviewed the applicant for an hour; this is the "pretest," and the city argues that it is not covered by the Constitution. Second, the examiner attaches the applicant to the machine so that the changes in the applicant's physiological responses are recorded as he answers. The examiner records disqualifying admissions during the pretest and marks the questions to which the physiological responses indicate a deceptive state of mind during the answer.

The pretest interrogation covered acts and associations that went from the incriminating to merely embarrassing. The examiners' denials of having asked impermissible questions were based on their dishonest theory that the law did not restrain the scope of the pretest. Even the police psychologist and assistant fire chief conceded that the two phases were integral and "all tied together." Transcript of Proceedings, Vol. IV, pp. 18, 80–81. The law does not just forbid asking questions about private, adult, consensual, legal sex acts while the citizen is hooked to a box of wires; the law forbids the assistant chief for personnel from asking the applicant those questions at all—in casual conversation or on computer-processable forms.

In addition, the city used this two-test polygraph process arbitrarily. The test itself could not ascertain the physical ability, training, or criminal history of an applicant. Medical examinations, questionnaires, and governmental records furnished the raw data for evaluation of qualification. The only basis the city had to use the polygraph was to verify the applicant's information. Even in this the polygraph was used arbitrarily.

Polygraph examiners are supposed to ask a list of precise questions that may be answered *yes or no*. The city's examiners had the city's list of questions, but they were not compelled to follow their training, and the tests varied from applicant to applicant. Each applicant was asked a different set of questions. Phrasing of the questions was the choice of the examiners. The examiner's private code, interpretable only by him, was the only record of the "exact" questions asked and answers given. No recording was made of the test. The examiners flouted an earlier court order that generally prohibits the use of questions like the intrusive ones in this case. *Tarver v. City of Houston*, 1979 WL 37, No. 73–1787, consent decree, Oct. 18, 1979. The examiner would ask shocking and embarrassing questions, sometimes causing the applicant to react nervously. After being asked several shocking questions, the applicant would remain tense increasing the likelihood of "failing" the test.

A finding of "deceptive response" was solely the decision of the operator. The applicant had no opportunity to show that the deceptive readings were false. Rejection was based on the questions chosen by the examiner, asked in a manner chosen by the examiner, and interpretable only by the examiner. In reconciling the conflicts between the individual and the state, the court must consider the procedural safeguards that are part of the governmental program. Here there were none. *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977).

### 5. *The City's Actors.*

The city's polygraph examiners' testimony was plagued with inconsistency, poor recollection, and bland denials of the city's polygraph process and the questions asked. The court finds most of the city's actors not credible.

Two of the examiners were incapable of answering questions without their being pressed. When pressed, Nadolski and Wood conceded that they asked whatever they were told to ask by superiors, that they kept no record of the hour-long pretest interview, that the records of the polygraph part (such as they were) were incomplete, and that they asked questions about sex with animals. Transcript of Proceedings, Vol. III, pp. 167–214.

Nadolski used "Have you ever hurt a loved one/Have you ever cheated in your life?" as a control question. Control questions are intended to establish a neutral base line for evaluation of later responses, and they usually consist of non-emotional, precise, known information. Insulting, inflammatory control questions destroy the validity of the whole test. Transcript of Proceedings, Vol. III, pp. 182–85.

Unlike Nadolski and Wood, examiner Davis was candid and cooperative. She readily admitted that the reliance was on the free-ranging pretest rather than the actual graphing. She admitted that she had asked Jagassar about extramarital affairs and stated that "that was a question that we ask all applicants." She also conceded that she had asked him about the number of times that he had engaged in sexual behavior outside his marriage, homosexual behavior, sexual be-

havior with animals, marijuana use at any time, arrests of family members, and religion. Transcript of Proceedings, Vol. III, pp. 145–67.

Wilfred Navarro, the airport police chief, was bureaucratically equivocal at best. His trial testimony and his deposition were generally inconsistent. He insisted that the polygrapher's report was used only as a basis for further research into those points that appeared to provoke a "deceptive" response, but he could identify no record or procedure evincing a later investigation in the instance of any applicant. Transcript of Proceedings, Vol. IV, pp. 45–47.

In a similar tone, the assistant fire chief, Dennis Holder, sermonized about honesty and integrity without being able to explain what the actual questions had to do with predictions of honest, capable performance. He was concerned with the commission of illegal acts, but he made no effort to eliminate questions from the approved form that asked about legal activity like association with "militant" groups and having arrested relatives. The assistant chief said that "militant" referred to people and groups who rioted in the '60s, making it a code for unacceptable socio-political associations. "In the political realm, as in the academic, thought and action are presumptively immune from inquisition by political authority." *Sweezy v. State of New Hampshire,* 354 U.S. 234, 266, 77 S.Ct. 1203, 1219, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring). Holder made no effort to see that the questions asked about a particular activity were phrased in terms of the applicant's having done the act as an adult when and where it was actually illegal. Transcript of Proceedings, Vol. IV, pp. 8–27.

To the police department's psychologist, Gregory Riede, everything was important and nothing was important. He knew nothing of the test process, but he relied on its results. His court-imposed job was to screen applicants for psychological conditions that would have a tendency to make the applicant dangerous in police work. People who were rejected by the polygraph failure were never interviewed by the psychologist. Transcript of Proceedings, Vol. IV, p. 58–95.

6. *Illegality.*

The city defended its use of these questions in general on the ground that it needed to know about the applicant's honesty, and the city says that honesty is implicated by every kind of illegal act. This "no crook may ever be a cop" theory fails in principle and practice. The questions went far beyond illegal acts of the applicant. The questions did not cover all illegal acts. No questions were asked, for instance, about hunting-related crimes. Many of the acts that the city treated as illegal were not illegal in Texas at the time of the test, like adultery and bestiality. Tex.Penal Code Ann. § 21 *et seq.* (1994). Some of the other acts were the lowest class of misdemeanor, like male homosexuality. *Id.* at § 21.06. The city had no idea whether the acts were illegal at the place and time they were done by the applicants.

7. *The Contracts.*

■ The court of appeals was concerned that the injunction against the city's asking unreasonably intrusive questions was unwarranted because, after this suit was filed, the city hired outside contractors to polygraph its applicants for public safety positions. These "independent" contractors have been assumed to have corrected the city's misuse of the polygraph screen, but the existence of the contractors simply transferred the city's defective process to the contractor, keeping the legal flaws intact.

The contracts had one-year terms. The contractors agreed to use a list of questions formulated by the city that are illegally intrusive. More important, the contract requires the service company to ask the questions the chiefs tell them to ask. The contracts have no safe guard about the dishonest division of the screening into a pretest conversation, which is unbounded and unrecorded, and the actual polygraph recording. It does no good to limit the test to a set of specific questions as long as the pretest is wildly intrusive, even if the test questions were proper.

8. *The Official Forms.*

The questions required by the contracts are impermissively broad in time and sub-

ject. The contracts require the independent contractors to use attached city-formulated questionnaires when performing the pretest and polygraph. The evidence at trial went beyond 1981; the 1984 airport police schedule of questions for the contractor to ask includes:

"Have you ever used marijuana in your life?"

"Have you ever committed public lewdness?" Defendants' Exhibit 2, Attachment B, page 2.

Incidentally, the fire department does not use the Penal Code definition of public lewdness, it uses an adolescent crudeness interpretation as shown by its "mooning" table of how much of a disqualification mooning is depending how frequent and recent. Tex.Penal Code Ann. § 21.07 (1994); Plaintiffs' Exhibit 6, page 2. In addition to those questions, the 1983 fire department questionnaire asks, "Have you engaged in any sexual activity for which you might be blackmailed or might cause embarrassment to the fire department?" Defendants' Exhibit 1, Attachment B, page 2.

Wood testified that the examination process takes from one and one-half to two hours, split evenly between the pretest and the test. Although the fire department form has twenty-seven required questions, Wood recorded having asked Goss only eleven questions during his September 1981 test. The eleven questions that were asked include several that are not on the list, so there is an incalculable difference. The standard practice is for there to be a fifteen second gap between questions; that is two and one-half minutes. Plaintiffs' Exhibit 31, page 13; Defendants' Exhibit 1, page 4; Defendants' Exhibit 2, Attachment A, page 2. It took counsel one whole minute to read those eleven questions at trial. When these times are added together, the total lapsed time for asking and answering Wood's eleven questions is three and one-half minutes, leaving the rest of the eighty-six and one-half minutes for the unstructured, unrecorded pretest interrogation and polygraph examination. Transcript of Proceedings, Vol. III, pp. 206–13.

Wood's log has an entry "L/2 yr. sex," which he says stands for "sex with a *male* within the last two years." Transcript of Proceedings, Vol. III, pp. 206–08. That question is on the approved list, *without* the time limit. Other approved questions include:

"Have you done anything in your life that you could be blackmailed for?"

"Have you ever had a venereal disease?"

"Have you ever had any type sex or sex play with an animal?" Plaintiffs' Exhibit 8, page 4.

In addition to the sex questions, the city follows the question about the applicant's overthrowing the government with questions about his family and friends being associated with communist-front organizations. It then requires these questions:

"Have you ever participated in any type militant organization or group?"

"Do you associate with anyone who has been in trouble with the authorities?"

Plaintiffs' Exhibit 8, page 4.

The "trained" contract personnel had the same license that the city employees had. Further, whatever the defects of the city-employee examiners, the contracts and schedules were prepared by policy-level officials and adopted by the city council. Defendants' Exhibit 1, page 1; Defendants' Exhibit 2, page 10. No basis exists to conclude that the city had modified its irresponsible screening process by the addition of the contractors.

9. *Privacy in Texas.*

 The protection of rights guaranteed in the United States Constitution is an absolute minimum that the states must meet. Texas has surpassed this minimum. The Texas Constitution's implicit right to privacy has a jurisprudential dignity that requires a governmental intrusion of privacy to serve a compelling objective that can be achieved by no less intrusive, more reasonable means. *Texas State Employees Union v. Texas Department of Mental Health and Mental Retardation,* 746 S.W.2d 203, 205 (Tex.1987).

The city asked each applicant questions that intruded into his private life beyond matters reasonably related to the actual requirements for the job he sought. The personally intrusive questions the city asked during the polygraph process were not narrowly, specifically, and directly related to his potential for capable performance of the job. The city tried to justify its questions about domestic harmony because it asserted that marital discord was the largest, single reason candidates withdraw from the academy. It furnished no data to support this claim. In any event, the city's interest in the tenure of a police officer extends far beyond the academy period. The city's investment in training is probably not recovered until two or more years of service, but its interest in a stable force was not shown to be remotely effected by questions about the applicant's married life rather than, say, relative pay scales, duty hours, danger, or the rest of the factors of the labor market for peace officers.

The city had other reasonable alternatives for acquiring the information about the applicants that it really needed such as physical examinations, criminal records, diplomas, employment history, and recommendations. The personnel files have reference checks and computer-generated "rap sheets" from Texas and the national data banks. The city's use of the explicit questions and the polygraph was an affront to the Texas Constitution.

10. *Class.*

This case was filed in 1982; the three individuals were found to be fairly representative of the class of applicants to the city's three police forces. Rather than speculate on whether the testing abuses were pervasive, consider the evidence in the record. Goss was tested three times over a three-year period by three different examiners, and each time he was subjected to the same intrusions. Nothing in the record suggests individual animosity between one of the applicants and one of the examiners; the examples are illustrations of business as usual. The city offered no evidence of exceptional circumstances to rebut that these three applicants were representative of applicants generally. The evidence was that the city treated all applicants to the unstructured and intrusive test, making class certification clearly appropriate.

Further, because this action has as its nucleus a pattern of conduct by the city, relief to one applicant would presumptively apply to other applicants, except for damages, which were *not* awarded to the class. The class-wide relief was the opportunity to reapply.

In a class action, the evidence at trial is limited to the facts of the representative parties' experience. The purpose of a class certification is to allow individual examples to stand for the universe of examples, simplifying the litigation. It cannot logically be held against the action's status as a class proceeding that the only evidence was about the class representatives. In this case, however, the logical necessity of the class process is supplemented by the city's own evidence of its universal practices.

A frequent problem with class actions is the high transaction costs they impose. By the time a review of the class certification had been suggested by the court of appeals, the city had already published the class-wide notice in the newspaper. As it happened, no member of the class responded within the time allowed, mooting the class relief. The absence of class claims for retesting was more the result of the age of the case before it was tried than an error of class designation in the first place.

The class aspect of this case has been carefully tailored to reduce the transaction costs and the risk of generating worthless additional claims. Neither the city nor the individual plaintiffs have an interest in reopening the class issue now, whether to expand or contract it. Although class relief was appropriate, it is unnecessary to reconsider the class since it has mooted itself.

11. *Injunctive Relief.*

Was an injunction a reasonably necessary component of the relief? Yes, an injunction was required to stop the city from reverting to its purposeful mistreatment of job applicants. The city's only evidence at

trial that it would not return to its practice of irrelevant questioning was its assertion that it had entered into a contract with a private company for future testing. The city cannot evade its responsibility for what is asked and how it is asked. The city demonstrated that the process required of the contractor assured violation of the law. The city generally neglected to attempt to establish that it had a formal credible commitment to lawfully rational use of the polygraph. The city has the burden of demonstrating convincingly that it has made recurrence highly unlikely. "[N]othing in the record provides any comfort to the plaintiff class or assurance to this court that the results of the almost-seven year litigation will not be lost and the wrongs ... be recommitted." *Jones v. Diamond,* 636 F.2d 1364, 1375 (5th Cir.1981).

The injunction is of precious little use to the actual plaintiffs except that they have, through their lawsuit, reinforced the city's existing duty for the next generation of job applicants. The city had its original duty to act correctly, and it was already operating under compulsion from a court order to meet that duty. This case is the city's third strike.

The city has shown that it will disregard court-imposed and self-imposed limits. The change to a contractor does not moot injunctive relief; it was not the polygraph company that was tried and that is bound. Instead, Houston is bound by the permanent injunction, and it is Houston's duty to insure that its contractors obey the injunction. If the city wants to use the polygraph, it must use it responsibly, and this court's injunction is an additional but necessary level of pressure on the city to see that the law is obeyed. As a practical matter, the injunction is the only relief the class got. The opportunity to reapply was a modest award, and it came too late to be of any use.

Even if this case or another of its kind were to be heard promptly, this is classically the type of case that brings a current city practice to the court's attention, and the current city practice can be changed instantly into a complying mode or a different evasive mode. No speed of the plaintiffs or the courts could catch the city, for each time the city would say that it had stopped. The traditional phrase is capable of repetition yet evading review. In this particular case, the city has said that it never asked those questions, but, if it did, it has stopped. Yet, although the city's documents show that the entire two-phase process should be recorded on audio or video tape and although the city's contracts require the service companies to have the ability to record the tests, the city has not done it. While this case was not tried for several years, the contracts are the city's only evidence of improvement, and of course, the contracts are confessions. *See County of Los Angeles v. Davis,* 440 U.S. 625, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979).

12. *Injuries Sustained.*

The abuse of each plaintiff caused individual economic injury, as each was denied the wages and benefits of working for the city. No plaintiff suffered physical or professional injury. This court awarded John Woodland $184,358.77 in lost wages and benefits, after deducting the amount he had earned, from the time of his rejection until this court's judgment in 1990. Similarly, this court awarded Ramdeo Jagassar $134,615.47 and Chris Goss $69,381.73. No question about these amounts was referred to this court on remand so they subsist.

13. *Conclusion.*

Factually and legally, the record supports the judgment of this court that the City of Houston needs to be enjoined from asking intrusive questions during its pre-employment polygraph screenings as delineated by this court's permanent injunction of February 20, 1990. *See Woodland v. City of Houston,* 731 F.Supp. 1304, 1306 (S.D.Tex.1990). No question has been raised about the stipulated damages for the individuals. The court's adoption of the jury verdict was its conclusion that illegal questions were indeed asked, and now independently, the court finds that the city's position that the questions were not asked was absolutely contradicted by its own exhibits of the old and revised procedures and by its own witnesses. The actual graphs from the city's machine show that the tests were not used to verify background facts. The political, family, and

sex questions were asked and were unreasonably intrusive in relation to the government's legitimate interest in screening applicants.

For all of its wires, graphs, needles, and straps, a polygraph examination is no more objective nor less manipulable than other means of screening prospective employees. Under the guise of scientific objectivity, the city abused a process that may have responsible uses, but in the city's practice, the polygraph machine was merely a prop—in the theater and engineering senses—to an inquisition of applicants wholly beyond the city's legitimate interests in honest officers. The arbitrary process of the test's imposition, evaluations, and recordation compounded the offense against liberty from the personal intrusion.

### FINAL JUDGEMENT

### and

### PERMANENT INJUNCTION

1. *Background.*

John Woodland, who applied for employment with the Houston Fire Department, Ramdeo Jagassar, who applied for employment with the Houston Police Department, and Chris Goss, who applied for employment with the Houston Airport Police, sued the city urging that the city's pre-employment polygraph examinations were arbitrary and were unreasonably intrusive under both the United States and Texas Constitutions. They sued for themselves and for others who were similarly situated as a class seeking damages, reinstatement, and injunctive relief.

The class was certified for the purpose of declaratory and injunctive relief. The liability questions were tried to the court with an advisory jury, and the damages questions were tried later before the court.

2. *Verdict.*

The court and jury found that the questions asked by Houston were unreasonably intrusive under separate definitions for the federal and state constitutional standards.

3. *Individual Damages.*

A. John Woodland. Had John Woodland been employed rather than rejected by Houston, he would have received from the city $184,358.77, as wages and other benefits (after having deducted what he had earned) from the time of his rejection until this judgment.

B. Ramdeo Jagassar. Had Ramdeo Jagassar been employed rather than rejected by Houston, he would have received from the city $134,615.47, as wages and other benefits (after having deducted what he had earned) from the time of his rejection until this judgment.

C. Chris Goss. Had Chris Goss been employed rather than rejected by Houston, he would have received from the city $69,381.73, as wages and other benefits (after having deducted what he had earned) from the time of his rejection until this judgment.

4. *Class Findings.*

The individual plaintiffs are representative of the class of applicants to the three city departments using the polygraph in pre-employment screening for jobs in security-sensitive positions, like fire and police; therefore, under the United States Constitution and independently under the Texas Constitution, the questions asked and the process used as part of Houston's pre-employment polygraph procedures were unreasonably intrusive as applied to the class members.

The class is composed of those people who applied for employment with the Fire, Police, or Airport Police Departments of the City of Houston since March 1980 and who were rejected because of some information or conclusion derived from the polygraph process, including the pretest interview and the examiner's opinion of the applicant.

5. *Class Conclusions.*

The questions asked and the process used as part of Houston's pre-employment polygraph procedures violate the constitutional limits on permissible governmental action es-

tablished by the United States Constitution to the injury of the class. Independently, those pre-employment polygraph procedures violate the limits on permissible governmental action established by the Texas Constitution to the injury of the class. This is an independent ground of recovery for the plaintiffs and the class under the separate and distinct content of the constitution and common law of Texas, which is in addition to and greater than that afforded by the national constitution.

### 6. *Declaratory Judgment.*

As a matter of the federal and state constitutions, the pre-employment polygraph procedures used by the City of Houston are declared to be an illegal intrusion on applicants for employment in the Fire, Police, and Airport Police Departments.

### 7. *Injunction.*

A. Scope. This injunction applies directly, under penalty of contempt, to the City of Houston, its officers, agents, employees, contractors, and others acting in concert with it.

B. Duration. This injunction is permanent.

C. Indirect Violation. The City of Houston is enjoined, directly or indirectly, from asking questions during the pre-employment process that do not have an articulable rational basis for discovering whether an applicant possesses actual qualifications reasonably related to the particular job; this prohibition applies to the specific methods used with the class members and any variation of it that suffers from the same irrational biases or unnecessarily intrusive information gathering.

D. Prohibited Actions. During the pre-employment screening of applicants for positions with the City of Houston's Fire, Police, and Airport Police Departments, use of a polygraph test and pre-test interviews of the applicant shall not include questions that:

(1) Intrude into an applicant's privacy or private concerns and affairs beyond matters reasonably related to actual requirements for the job which the applicant seeks; and

(2) Have not been narrowly, specifically, and directly tailored to the applicant's potential for capable performance of the job; and

(3) Inquire into matters that the city has other reasonable alternative methods for acquiring the information; and

(4) Have been prohibited specifically by this injunction.

(5) Inquire about:

a. The applicant's religion, religious practices, or lack of them;

b. The applicant's consensual sexual activity, except to the extent that the act was unlawful in the jurisdiction where it took place and involved a minor and occurred within three years of the screening;

c. Extramarital sex;

d. Crimes committed as a child, except to the extent they were a violent felony, physical injury, or sexual assault, or the applicant was tried and convicted for them as an adult;

e. The use of marijuana, except to the extent that it was used unlawfully by the applicant in the jurisdiction where it was used within the six months preceding the screening process; no illegal use of marijuana can be used to disqualify an applicant unless similar level offenses are similarly used as disqualifications, like traffic, drinking, or hunting violations;

f. Adult criminal behavior, except to the extent that the applicant was convicted of a felony, a sexual assault, theft, a Class A misdemeanor, or caused serious injury;

g. Theft, unless it involved at least $25 and occurred within the six months before the screening process or there have been four thefts within the two years preceding the screening process;

h. Membership in organizations, except to the extent that the applicant is currently or, within the previous five

years, has been an active member of an organization that advocates violent, unlawful acts;

i. Drug use, unless the questions are about the applicant's illegal use of uppers, downers, steroids, or cocaine in the last twelve months; or hallucinogens within five years; or heroin within twelve months and more than one use in five years.

j. Criminal behavior by family members except to the extent that it involves a conviction for felony adult criminal behavior by a relative or friend with whom the applicant lives or with whom the applicant has a relationship that would adversely affect the applicant's ability uniformly to enforce the law or with whom the applicant has engaged in joint criminal behavior as an adult, to the extent that inquiry is allowed;

k. Confidential medical information, unless done as part of an examination by licensed medical personnel; and

l. Matters into which the city cannot otherwise legally inquire.

E. Required Acts.

(1) Recordation. To insure evidence of non-intrusiveness of future polygraph procedures, the City of Houston shall also require that either audio or audio-video recordings be made of all polygraph procedures (interviews and tests) and preserved for six months after the final written rejection or acceptance. Applicants who are rejected who have been subjected to the polygraph process shall be given a detailed explanation of the reasons for the rejection, an opportunity to explain their performance, a copy of the interview and test tapes, and time after the review to appeal the rejection.

(2) Notices.

a. Future Applicants. Applicants for positions in the three departments shall be given a written notice of this injunction, the taped record, and their right to review it and to appeal:

A United States Court has ordered that there are many limits to the City of Houston's use of polygraph tests in the screening of people who apply for work in the Fire, Police, and Airport Police Departments. The city must keep a tape of your interview and test for six months, and you have the right to review it. If you are rejected, you have a right to a written explanation and an appeal.

b. Past References. The City of Houston shall advise anyone that it has already provided with information about the class's polygraph tests or results, either in writing or orally, that the polygraph tests were improperly administered and violated the law and shall request in writing that all references about Houston's pre-employment polygraph procedures be removed from files on the class members.

c. [The re-application sections have been omitted as moot.]

(3) File Cleaning. The City of Houston shall destroy, without copying or otherwise preserving the contents, all polygraph examination documents and delete from the records in its control or possession all references to polygraph tests administered to Woodland, Jagassar, and Goss by the City of Houston, except the files maintained by the Legal Department about this case, which files are to be kept confidential and with the Legal Department's exclusive control. The City of Houston shall destroy all polygraph examination documents and delete from the records in their control or possession all references to polygraph tests administered to class members by the city.

(4) [Omitted as moot.]

(5) [Omitted as moot.]

## 8. *Attorney's Fees and Costs.*

The plaintiffs have also sought attorneys' fees and costs. The reasonable attorneys' fees for the necessary services in the prosecution of this action for the plaintiffs and the costs reasonably necessary properly to pur-

sue this litigation, in addition to those taxed as costs of court, are $102,551.00.

9. *Award.*

It is adjudged that these people recover from the City of Houston severally these amounts:

A. John Woodland: Damages and pre-judgment interest of $184,358.77;

B. Ramedo Jagassar: Damages and pre-judgment interest of $134,615.47;

C. Chris Goss: Damages and pre-judgment interest of $69,381.73; and

D. Woodland, Jagassar, and Goss, jointly and severally:

(1) Attorney's fees of $94,275.00;

(2) Costs of $8,276.00;

(3) Court costs; and

(4) Post-judgment interest at 7.97% per annum.