Samuel **ANDRADE**, Jr., **Plaintiff**,

v.

**CITY OF SAN ANTONIO; Robert Ojeda, in his Individual and Official Capacities as Fire Chief; and Alex Briseno, Individually and in his Capacity as City Manager, Defendants.**

**No. Civ.A. SA99CA1292NN.**

United States District Court,
W.D. Texas,
San Antonio Division.

Jan. 16, 2001.

Randolph P. Tower, Clemens & Spencer, San Antonio, TX, pro se.

Larry R. Daves, Larry R. Daves & Associates, San Antonio, TX, for Samuel Andrade, Jr.

Lowell F. Denton, Denton & Navarro, San Antonio, TX, for City of San Antonio, Robert Ojeda, Alex Briseno.

## *ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

NOWAK, United States Magistrate Judge.

### I. *Introduction*

In this lawsuit, plaintiff, Samuel Andrade Jr., complains that defendants, the City of San Antonio, Fire Chief Robert Ojeda, and City Manager Alex Briseño (collectively referred to as "the City"), improperly rejected him for appointment to a beginning firefighter position with the San Antonio Fire Department ("S.A.F.D."). Andrade contends that the City's actions, and in particular his initial rejection and

1. Docket no. 31 (First Amended Complaint).

2. Docket no. 45.

3. Docket no. 49.

4. Docket no. 52. Docket no. 64. The parties have also filed advisories with respect to

eventual termination from employment, constituted national origin discrimination under Title VII, free speech retaliation, in violation of the First Amendment of the United States Constitution, as well as violations of his free speech and due process rights under the Texas Bill Of Rights of the Texas Constitution.[1] Upon consent of the parties to proceed on an expedited docket, the case was assigned to me for all purposes, including entry of final judgment, in accordance with 28 U.S.C. § 636(c).

The City has moved for summary judgment on all of Andrade's causes of action.[2] Andrade has filed his opposition to the motion.[3] In addition, both parties filed replies.[4] I set the City's summary judgment motion for oral argument and the same was held on October 26, 2000. Having heard oral arguments by counsel, reviewed the pleadings on file and supporting summary judgment evidence, as well as the applicable case law, it is my opinion that summary judgment should be granted, in part, and denied in part.

### II. *Jurisdiction*

Andrade's amended complaint predicates jurisdiction of this court under 42 U.S.C. § 2000e–5(f) & 28 U.S.C. § 1343(4).[5] This court also has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

### III. *Factual and Procedural Background*

The hiring practices followed by the City in the selection and rejection of firefighters have been the subject of extensive litigation in recent years, in both state and

plaintiff's burden in establishing his *prima facie* case of discrimination under Title VII. Docket nos. 67 & 68.

5. Docket no. 31, at 1.

federal courts. Because some of the prior litigation is relevant to the instant lawsuit, it is necessary to discuss it within the factual context of this case.

It is undisputed that the Texas Civil Service Act ("the Act") governs the application procedures for a beginning position with the S.A.F.D.[6] According to the statutory provisions in effect at the time of Andrade's application made the basis of this suit, all applicants wishing to become firefighters were required to take a qualifying entrance examination.[7] Prior to the entrance exam, applicants are required to select a lottery number in the event of tied scores, and those with military service are given an additional five points.[8] After the tests are graded, and any applicable veteran points added, any tied scores are resolved by the lottery numbers.[9] The applicants are then placed on the eligibility list in order of rank.[10] The list is certified, and for purposes of appointments, is only effective for one year.[11] Although the Act sets forth the procedure for the entrance examination and the minimum qualifications needed,[12] the S.A.F.D. also has a list of qualification factors and hiring procedures for firefighter applicants.[13] The list appears to incorporate state and civil service requirements, as well as contain additional requirements applicable to the hiring process. The list, dated December 2, 1996, was approved by Fire Chief Ojeda.[14]

According to the S.A.F.D.'s application guidelines, in addition to taking the entrance examination, an applicant is considered suitable for a beginning firefighter position with the S.A.F.D. if he or she meets the following additional requirements: a physical agility test, a physical and mental examination, a background investigation, a screening board interview and a polygraph examination.[15] If an applicant fails any one of these requirements, the applicant's file is brought to Fire Chief Ojeda's attention for verification of the results and the applicant is notified in writing that he or she has been automatically disqualified from further consideration. If an applicant is not automatically disqualified during the application process, the applicant is deemed suitable for consideration.[16]

As vacancies arise, the Act mandates that the chief executive "shall appoint the person having the highest grade unless there is a valid reason why the person having the second or third highest grade should be appointed."[17] If the person

6. TEX. LOC GOV'T CODE ANN. § 143.001 et seq. (Vernon 1999 & Supp.2000). Even though the Act was later amended in 1999, for purposes of this case, the controlling statutory provisions are those that became effective September 1, 1987.

7. TEX. LOC GOV'T CODE ANN. § 143.025.

8. Docket no 44, at 2; and TEX. LOC GOV'T CODE ANN. § 143.025(e).

9. Docket no. 44, at 2.

10. TEX. LOC GOV'T CODE ANN. § 143.025(b).

11. See Firemen's & Policemen's Civil Service Commission v. Williams, 531 S.W.2d 327, 328 (Tex.1975); & TEX. LOC GOV'T CODE ANN. § 143.025(g).

12. TEX. LOC GOV'T CODE ANN. §§ 143.023 & 143.1051.

13. Docket no. 49, Andrade's Declaration, at Exhibit 37.

14. Id.

15. Docket no. 44, at 2; and Docket no. 49, Andrade's Declaration, at Exhibit 37.

16. Docket no. 44, at 2 & Exhibit C; Docket no. 49, Andrade's Declaration and relevant attachments.

17. TEX. LOC GOV'T CODE ANN. § 143.026(b).

with the second or third highest score is selected over the person with the highest score, the Chief Executive shall state "good and sufficient reasons" for the selection of that person over the one with the highest score.[18] This statutory process is referred to as the "rule of three."[19] The person appointed must serve a probationary one-year period "after which the person automatically becomes a full fledged civil service employee with full civil service protection."[20]

In the past, the City has admittedly failed to comply with the statutory "rule of three" provision in that the Fire Chief, and not the Chief Executive who in San Antonio is the City Manager, has been the one selecting or rejecting applicants for beginning positions. In April of 1997, Gina Marie Montemayor, filed a state court lawsuit against the City, challenging this very same practice.[21] The state court issued a temporary injunction and Montemayor was placed in the City's Firefighter Training Academy class pending final resolution of her claims.[22] Thereafter, the City discontinued the former process and the City Manager as Chief Executive began applying the "rule of three" to all applicants for each academy class since the *Montemayor* suit was filed, including the academy class made the basis of this suit.

In the instant case, the record shows that Andrade took the entrance examination on August 6, 1996.[23] Based on his high score, Andrade was certified as applicant number 87 on the Firefighter Trainee Eligibility List that was processed for the 1997–B training academy class. Andrade was then asked to report to the San Antonio Police Training Academy to undergo a physical fitness test. Upon passing the physical, Andrade received detailed instructions from the Head of Applicant Processing, Lieutenant Hines, as to the remaining steps in the hiring process. Specifically, Andrade was informed that the hiring process consisted of the background investigation, screening board interview, polygraph report, physical exam, psychological exam and the chief's final review.[24]

Even though his background investigation revealed questionable information concerning a vehicle accident, his college transcript and past employment, he was not automatically disqualified at that stage.[25] He also passed the fourth step of the process, namely, the screening board interview.[26] Andrade, however, failed the polygraph exam on May 3, 1997.[27]

According to the summary judgment evidence, Andrade's polygraph results revealed deceptive answers to the following three questions: relevant question no. 3, involving thefts; relevant question no. 8, regarding the commission of a serious undetected crime, and relevant question no.

---

18. § 143.026(c).

19. Docket no. 44, at 2.

20. *Klinger v. City of San Angelo*, 902 S.W.2d 669, 672 (Tex.App.—Austin 1995, writ denied).

21. *Montemayor v. City of San Antonio*, style no. 97–CI–05550.

22. Docket no. 44, at 3.

23. Docket no. 49, Andrade's Declaration, Exhibit 1. According to Andrade's sworn testimony, he had passed the written exam prior to August of 1996 "but was never ranked high enough on the eligibility list to be reached in the hiring process." Andrade's Declaration, at ¶ 1.

24. *Id.* at Andrade's Declaration, ¶¶ 3 & 37.

25. *Id.* at Andrade's Declaration, ¶ 7.

26. *Id.* at Andrade's Declaration, at 2–3.

27. Docket no. 44, at Exhibit A.

12, concerning any lies or intentional withholding of information in his application with the S.A.F.D.[28] The polygraph examiner notified Andrade of his failure to pass the polygraph and allowed him the opportunity to explain his deceptive responses. The examiner also gave Andrade two options: to retake the polygraph exam one final time on the same day to clear his deceptive responses or retake it at a later date with a different examiner. Andrade elected to proceed and retake the polygraph with the same examiner.[29] Significantly, Andrade signed a Voluntary Polygraph Statement acknowledging his understanding that if he failed the polygraph exam again, his application would be withdrawn from consideration, and he would have to wait one year to reapply.[30] Andrade's second polygraph showed deception in responding to the same questions as his first polygraph. Andrade was unable to offer an explanation for his performance in relation to those questions.[31] Further, it appears that Andrade did not object to any of the polygraph questions or to the examiner's conduct during both polygraphs. His only concern at the time was to complete the application process.[32]

The City contends that due to the changes in the application process implemented in response to the *Montemayor* suit, the application process for the 1997–B academy class was delayed.[33] As a result, despite Andrade's failure to pass the polygraph exam with non-deceptive answers, the City did not immediately request the Civil Service Commission ("the Commission") to remove his name from the eligibility list.[34] On September 3, 1997, however, Fire Chief Ojeda formally requested the Commission to remove Andrade's name from the list finding him unsuitable for employment.[35] Failing to pass the polygraph exam with non-deceptive answers was only one of the five reasons relied upon by the Fire Chief in petitioning the Commission to remove Andrade from the eligibility list. Other reasons included: unacceptable driving record (vehicle rollover); unacceptable work history; and Andrade's own admissions to initiating an altercation at a night club and of having a bad temper.[36]

Because the 1996 eligibility list was due to expire, and he was facing immediate removal from same, on September 11, 1997, Andrade and another applicant similarly-situated, William Sawers, filed suit in state court challenging the City's alleged illegal hiring practices. Previous to the *Andrade*'s state lawsuit, other applicants, including Montemayor as mentioned above, had filed similar claims against the City.[37] The state courts issued temporary injunctions in favor of Andrade and the

---

28. *Id.*

29. *Id.*

30. *Id.* at Exhibit B.

31. *Id.* at Exhibit A.

32. *Id.*, Exhibit A, at 4.

33. Docket no. 44, at 4; and Docket no. 49, Andrade's Declaration, ¶¶ 14–26.

34. Docket no. 44, at 4; Exhibit C, at 2; and Exhibit D, at 1.

35. Docket no. 49, Andrade's Declaration, Exhibit 11; and docket no. 44, Exhibit D, attachment 2.

36. Docket no. 44, Exhibit D, attachment 2. *See also* Docket no. 49, Andrade's Declaration, at ¶¶ 27–29.

37. *Andrade et al. v. City of San Antonio, et al.,* Style No. 97–CI 13212. The previous state court lawsuits were: *Veronica Cortes et al. v. City of San Antonio,* Style No. 97–CA–12239 and *Keith Benson et al. v. City of San Antonio,* Style No. 97–CI–12932.

other state court litigants allowing them to be placed in the City's Fire Fighter Training Academy pending final resolutions of their claims.[38] Shortly after the issuance of the temporary injunctions, City Manager Briseño applied the "rule of three" to Andrade and to the other state court litigants.[39] Briseño concluded that valid reasons existed for their rejection, but that due to the state court orders, they were nevertheless placed in the academy.[40]

With respect to Andrade, Briseño provided in writing what he considered "good and sufficient reasons" for his decision to apply the "rule of three," as mandated by § 143.026(c) of the Act.[41] In addition to the five reasons relied upon by Fire Chief Ojeda in his September 3, 1997 letter, City Manager Briseño cited Andrade's arrest for outstanding warrants in 1990; misrepresentation of his driving record and his admission to prior marijuana use.[42]

While Andrade was in the training academy, the Texas Fourth Court of Appeals issued its decision in the *Montemayor* case holding that probationary firefighters are at-will employees who serve at the discretion of the Fire Chief and are subject to being terminated without cause.[43] Significantly, the *Montemayor* court relied on the Act's characterization of a firefighter, police officer, or academy trainee (such as Andrade) as a one-year probationary employee.[44] During the probationary period, "the department head shall discharge the [probationary] person and remove the person from payroll *if the person's appointment was not regular or was not made in accordance with this chapter or the commission rules.*"[45] Once the probationary employee completes the probationary period, the employee "becomes a full-fledged civil service employee and has full civil service protection."[46]

Based on the developments in the *Montemayor* case, on March 12, 1998, at the conclusion of the training academy, Fire Chief Ojeda exercised his discretion and terminated Andrade's employment, finding that he did not meet the traditional standards and qualifications for a beginning position in the S.A.F.D.[47] According to Fire Chief Ojeda's sworn testimony, he terminated Andrade's employment for the same reasons that he initially recommended that he be removed from the eligibility list as unsuitable.[48] On the same date, City Manager Briseño issued a letter

---

38. Docket no. 44, Exhibit F.

39. *Id.* at 6.

40. *Id.* & Exhibit G.

41. *Id.*

42. *Id.*

43. *Montemayor v. City of San Antonio*, 985 S.W.2d 549, 551 (Tex.App.—San Antonio 1998) (probationary firefighter has no civil service protections and may be terminated at the discretion of the Fire Chief). *See also Jones v. Ojeda et al.*, 21 S.W.3d 569, 571 (Tex.App.—San Antonio 2000), where the court held that other than setting out a procedure for examination and qualification for the eligibility list, the Civil Service Act does not grant protected status to applicants or new

firefighters, who are instead characterized as one-year probationary employees.

44. Tex. Loc Gov't Code Ann. § 143.027(a). Thus, for example, if Andrade began the training academy on September 29, 1997 as he alleges in his EEOC charge, his one year probationary status expired a year later on September 29, 1998. Notably, Andrade was terminated from employment before the expiration of his probationary period.

45. Tex. Loc Gov't Code Ann § 143.027(b) (Emphasis added).

46. *Id.*

47. Docket no. 44, Exhibit I.

48. *Id.* at 20 & Exhibit D.

concurring with Fire Chief Ojeda's decision to terminate Andrade.[49] All the state court litigants who had been initially rejected, whether Hispanics or non-Hispanics, females or males, appeared to have been terminated in the same manner as Andrade.[50]

Andrade filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 2, 1998 alleging that the Fire Chief's decision to terminate his employment prior to entering firefighter service, constituted discrimination on the basis of his Hispanic national origin.[51] Specifically, Andrade argued that at least two other Anglo applicants, with lower qualifications and more questionable backgrounds than he had, remained employed with and proceeded to be appointed for S.A.F.D. positions. At the request of Andrade, the EEOC issued its right to sue letter on September 17, 1999.[52] Andrade timely filed this lawsuit in federal district court on November 3, 1999.[53]

### IV. *Issues Presented*

The City's motion for summary judgment presents the following issues:

1. Whether Andrade has established a *prima facie* case of disparate treatment discharge on the basis of his Hispanic national origin under Title VII and/or the Equal Protection Clause of the Fourteenth Amendment?

2. Whether Andrade can establish his *prima facie* case of First Amend-

ment retaliation under § 1983 of the Civil Rights Act?

3. Whether Fire Chief Ojeda and City Manager Briseño are entitled to qualified immunity on Andrade's § 1983 claims in their individual and official capacities?

4. Whether Texas law precludes Andrade's request for reinstatement and other equitable relief based on violations of the Texas Constitution?

5. Whether Andrade can establish his *prima facie* case of a constitutional deprivation or other federally protected rights as a result of some official policy, practice or custom of the City?

### V. *Summary Judgment Standard*

The applicable standard in deciding a motion for summary judgment is set forth in FED.R.CIV.P. 56, which provides in pertinent part as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.[54]

Mere allegations of a factual dispute between the parties will not defeat an otherwise proper motion for summary judgment. Rule 56 requires that there be no genuine issue of material fact.[55] In an employment discrimination case such as

---

**49.** *Id.* at Exhibit I(a).

**50.** Docket no. 49, Andrade's Declaration, at Exhibit 31.

**51.** Docket no. 44, Exhibit J; and docket no. 1.

**52.** *Id.* at Exhibit L.

**53.** Docket no. 1.

**54.** FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**55.** *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

this one, the court focuses on whether a genuine issue of material fact exists as to whether the defendant intentionally discriminated against the plaintiff.[56] A fact is material if it might affect the outcome of the lawsuit under the governing law.[57] A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.[58] Therefore, summary judgment is proper if, under governing laws, there is only one reasonable conclusion as to the verdict; if reasonable finders of fact could resolve a factual issue in favor of either party, summary judgment should not be granted.[59]

The movant on a summary judgment motion bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record which it alleges demonstrate the absence of a genuine issue of material fact.[60] To satisfy this burden, the movant must either submit evidentiary documents that negate the existence of some material element of the nonmoving party's claim or defense, or if the crucial issue is one for which the nonmoving party will bear the burden of proof at trial, merely point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmoving party's claim or defense.[61] Regardless of whether the movant accompanies its summary judgment motion with affidavits or other evidentiary materials, the motion must be granted if the evidence before the court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied.[62] Once the movant has carried that burden, the burden then shifts to the party opposing the motion to present affirmative evidence in order to defeat a properly supported motion for summary judgment.[63]

The nonmoving party cannot discharge this burden by referring to the mere allegations or denials of the nonmoving party's pleadings.[64] Rather, the nonmovant must, either by submitting opposing evidentiary documents or by referring to evidentiary documents already in the record, set out specific facts showing the existence of a genuine issue for trial.[65] The court will look at the record in the light most favorable to the nonmovant drawing all inferences most favorable to that party.[66]

56. See La Pierre v. Benson Nissan, Inc., 86 F.3d 444, 447 (5th Cir.1996) (citing Armstrong v. City of Dallas, 997 F.2d 62, 65–66 (5th Cir.1993)).

57. Anderson, 477 U.S. at 248, 106 S.Ct. 2505; Thomas v. LTV Corp., 39 F.3d 611, 616 (5th Cir.1994).

58. Id.; Wise v. E.I. DuPont De Nemours & Co., 58 F.3d 193, 195 (5th Cir.1995).

59. Anderson, 477 U.S. at 249, 106 S.Ct. 2505.

60. Celotex Corp., 477 U.S. at 323, 106 S.Ct. 2548.

61. Edwards v. Aguillard, 482 U.S. 578, 595 n. 16, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); and Celotex Corp., 477 U.S. at 325, 106 S.Ct. 2548.

62. Id.

63. Anderson, 477 U.S. at 257, 106 S.Ct. 2505.

64. FED.R.CIV.P. 56(e); Anderson, 477 U.S. at 250, 106 S.Ct. 2505; State of Texas v. Thompson, 70 F.3d 390, 393 (5th Cir.1995).

65. Celotex Corp., 477 U.S. at 324, 106 S.Ct. 2548; Fields v. City of South Houston, Texas, 922 F.2d 1183, 1187 (5th Cir.1991); Neff v. American Dairy Queen Corp., 58 F.3d 1063, 1065 (5th Cir.1995), cert. denied, 516 U.S. 1045, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996).

66. Hibernia Nat'l Bank v. Carner, 997 F.2d 94, 97 (5th Cir.1993). See also Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir.1994) (holding that a nonmovant cannot discharge her burden with doubt as to the material facts, by conclusory allegations, unsubstanti-

Nevertheless, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the non-movant's burden." [67] Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial.[68]

Accordingly, summary judgment motions permit the court to resolve lawsuits without the necessity of trials if there is no genuine dispute as to any material facts and the moving party is entitled to judgment as a matter of law.[69]

## VI. *Analysis*

### 1. *Title VII Claim: Disparate Treatment Based on National Origin*

■ Andrade's Title VII claim is based on his termination from employment on March 12, 1998. He alleges that his termination resulted from the unequal treatment he received by the Fire Chief and City Manager during the review phase of his application file, as well as City Manager Briseño's application of the "rule of three." [70] The City has moved for summary judgment on Andrade's Title VII claim arguing that Andrade cannot meet the second element of his *prima facie* case, that is, that he was qualified for a beginning firefighter position. Specifically, the City relies on Andrade's failure in passing the polygraph exam with non-deceptive answers, as required of all individuals apply-

ing for beginning positions with the S.A.F.D.

Andrade opposes the City's arguments by maintaining that he was qualified for a beginning firefighter position because he met all the minimum statutory requirements for the position. Further, he maintains that other firefighter trainees, of Anglo origin, who had lower qualifications and more questionable backgrounds than he had, were able to remain employed with the S.A.F.D. In addition, Andrade argues that a statement purportedly made by the head of the application process, to the effect that in his opinion, there were too many Mexicans on the eligibility list, constitutes direct evidence of discrimination by the City.[71] Concerning failing the polygraph, Andrade contends that the reasons given for his termination were extracted through an illegal polygraph; and thus, his failure to pass it cannot be considered a legitimate non-discriminatory reason for his termination. Based on my review of the record, I find that Andrade has not brought forth competent summary judgment evidence establishing that he was qualified for a beginning firefighter position and that other similarly-situated firefighter trainees, non-members of his protected class (*i.e.*, non-Hispanics), remained employed by the S.A.F.D.

As a threshold matter, it should be noted that according to Andrade's EEOC charge of discrimination, he only complained of his rejection from employment

ated assertions, or by only a scintilla of evidence).

**67.** *See Douglass v. United Services Auto. Ass'n,* 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr,* 19 F.3d 1527, 1533 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)).

**68.** *Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. 2548 ("In such situation, there can be 'no genuine issue as to any material fact,' since a

complete failure of the proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). *Id.* at 323, 106 S.Ct. 2548.

**69.** *See Fields,* 922 F.2d at 1187.

**70.** Docket no. 49, Andrade's Declaration, at ¶¶ 35–47.

**71.** Docket no. 49, at 3–8.

on March 12, 1998. Consequently, Andrade is now precluded from raising any claims, such as any disparate impact claims in relation to his 1996 entrance exam because it was not previously brought before the EEOC for adjudication.[72] This much has been conceded by Andrade in his response.[73] Nevertheless, because the City purportedly relied on the same reasons for terminating Andrade's employment in March of 1998 as it did when it initially rejected his application in September of 1997, I find that any disparate claims Andrade may have concerning the reasons for his termination as given in 1997, and later ratified in 1998, are properly before this court.

Before addressing the substantive merits of Andrade's Title VII claim, a discussion of the analytical framework applicable to Title VII actions, is warranted.

## A. Analytical Framework

A plaintiff can prove a claim of intentional discrimination by either direct or circumstantial evidence. Absent direct evidence of discriminatory intent, as is in this case,[74] proof via circumstantial evidence is.

evaluated using the framework set forth in the seminal case of *McDonnell Douglas Corp. v. Green*.[75] "First, the plaintiff must establish a prima facie case of discrimination."[76] Second, the employer must respond with a legitimate, nondiscriminatory reason for its decision.[77] The burden on the employer is only one of production, not persuasion, involving no credibility assessments.[78] Third, if the employer carries its burden, the "mandatory inference of discrimination" created by the plaintiff's prima facie case,[79] "drops out of the picture" and the fact finder must "decide the ultimate question: whether [the] plaintiff has proven [intentional discrimination]."[80]

In making this showing, the plaintiff can rely on evidence that the employer's reasons were a pretext for unlawful discrimination.[81] "[T]he trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual.' "[82] However, as the United States Supreme Court stated in *Hicks*, a showing of pretext does not automatically entitle an employee to a judgment as a

---

**72.** 42 U.S.C. § 2000e–5. To the extent that Andrade relies on the 1996 events in support of his § 1983 claims, they are also barred by the applicable two-year statute of limitations. *See Eugene v. Alief I.S.D.*, 65 F.3d 1299, 1306 (5th Cir.1995), *cert. denied sub nom., Conley v. Eugene*, 517 U.S. 1191, 116 S.Ct. 1680, 134 L.Ed.2d 782 (1996).

**73.** Docket no. 49, at 3 & fn. 1.

**74.** As discussed later in this Order, the statement Andrade has assigned to Lieutenant Hines to the effect that there were too many Mexicans in the application pool, is a hearsay statement that cannot serve as direct evidence of discrimination.

**75.** 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**76.** *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

**77.** *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817.

**78.** *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 255–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

**79.** *Id.* at 256 & n. 10, 101 S.Ct. 1089.

**80.** *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510–12, 113 S.Ct. 2742, 125 L.Ed.2d 407, 418–20 (1993).

**81.** *See McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817.

**82.** *Reeves*, 120 S.Ct. at 2106 (quoting *Burdine*, 450 U.S. at 255 & n. 10, 101 S.Ct. 1089).

matter of law.[83] It is "not enough … to *dis*believe the employer; the [fact finder] must *believe* the plaintiff's explanation of intentional discrimination." [84] This statement in *Hicks* apparently caused confusion as to whether intentional discrimination could be inferred from a showing of pretext.[85]

The United States Supreme Court recently resolved the circuit split in *Reeves* by rejecting the "pretext-plus" approach, thus overruling the Fifth Circuit's decision in that case.[86] A unanimous Court held that the Fifth Circuit had "misconceived the evidentiary burden borne by plaintiffs who attempt to prove intentional discrimination through indirect evidence." [87] "Thus, a plaintiff's prima facie case, *combined* with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." [88] Before the court can engage in the analysis of pretext evidence, a plaintiff must first meet his *prima facie* case of intentional discrimination.

The Court in *Reeves* further stated that, more likely than not, a showing of pretext will lead to an inference of discrimination: "Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." [89]

The *Reeves* Court also cautioned that there may be instances, although rare, where a showing of pretext would not be sufficient to infer discrimination. Such a situation would occur "if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination occurred." [90]

With this framework in mind, I will proceed to analyze Andrade's evidence in support of his *prima facie* case of national origin discrimination under Title VII.

83. *Hicks,* 509 U.S. at 524, 113 S.Ct. 2742.

84. *Id.* at 519, 113 S.Ct. 2742 (Emphasis in original).

85. *Reeves,* 120 S.Ct. at 2104–05 (describing the circuit conflict resulting from the confusion).

86. *Reeves v. Sanderson Plumbing Products, Inc.,* 197 F.3d 688 (5th Cir.1999); and *Reeves,* 120 S.Ct. at 2108.

87. *Reeves,* 120 S.Ct. at 2108.

88. *Id.* at 2109 (Emphasis added).

89. *Id.* at 2108–09.

90. *Id.* at 2109 (emphasis added). The *Reeves* ruling rejected part of the Fifth Circuit's decision in *Rhodes v. Guiberson Oil Tools,* 75 F.3d 989 (1996). In so doing, the Court noted that

*Rhodes* stood for the proposition that the "plaintiff must introduce sufficient evidence for [the] jury to find *both* that [the] employer's reason was false and that [the] real reason was discrimination." *Reeves,* 120 S.Ct. at 2105 (emphasis added) (statement in parenthetical). This pretext-plus requirement is contrary to the *Reeves* Court's holding that the employer's prevarication may be sufficient in many cases to demonstrate discriminatory animus. *Id.* at 2108–09. While portions of the *Rhodes* decision do not appear to fully comport with *Reeves,* the Fifth Circuit has already recognized central features of the *Rhodes* decision that survive *Reeves. See Vadie v. Miss. State Univ.,* 218 F.3d 365, 373 n. 23 (5th Cir.2000) ("*Rhodes* is consistent with *Reeves* and continues to be the governing standard in this [Fifth] Circuit."). Nevertheless, in evaluating plaintiff's discrimination claim under the *McDonnell Douglas* framework, this court is cognizant that it must not unduly restrict a plaintiff's circumstantial case of discrimination.

## B. *Application of the Analytical Framework*

Title VII provides that:

[i]t shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges or employment, because of such individual's race, color, religion, sex, or national origin.[91]

Under the *McDonnell Douglas* circumstantial evidence framework, to establish a *prima facie* case of disparate treatment discharge on the basis of national origin, Andrade must prove that: (1) he is a member of a protected group; (2) he was qualified for the job he held or the position he sought; (3) he was discharged; and (4) after his discharge, the City filled the position with a person who was not a member of the protected group.[92] Because Andrade does not allege that the City replaced him with an individual not in his protected group, the fourth element of the *prima facie* case is, more appropriately, that after Andrade's discharge, others who were not members of his protected class remained in similar positions.[93] Moreover, to succeed in establishing his *prima facie* case of disparate treatment, Andrade must show that other similarly-situated employees, non-members of his protected class, were treated differently under circumstances "nearly identical to his."[94]

It is undisputed that Andrade failed one of the requirements for a beginning position with the S.A.F.D., namely, to pass a non-deceptive polygraph exam. Andrade (as did all other applicants) knew, from the inception of his application process, that passing a polygraph exam with non-deceptive answers was a requirement for employment with the S.A.F.D.[95] According to the summary judgment record, it is also undisputed that the City required all applicants to pass a polygraph exam before considering them suitable for employment. Further, there is no evidence that the polygraph exam taken by Andrade was any different than the one administered to other applicants. Moreover, by signing the Voluntary Polygraph Statement, Andrade acknowledged his understanding that his application would be withdrawn if he failed the polygraph exam. The record is also devoid of any evidence that Andrade objected to any of the polygraph exam questions when he first took the exam or when he retook it. There is also no evidence that at the time he took the polygraph examination, including the retake, that he complained about the manner in which the polygraph examiner conducted the test. In fact, it is undisputed that when given the opportunity to retake the polygraph with another examiner, Andrade chose to retake it with the same examiner.

Besides arguing that polygraph exams are generally inherently unreliable and thus inadmissible as a matter of law, An-

---

91. 42 U.S.C. § 2000e–2(a)(1).

92. *See Vaughn v. Edel,* 918 F.2d 517, 521 (5th Cir.1990).

93. *See Burdine,* 450 U.S. at 254 n. 6, 101 S.Ct. 1089; *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. In those cases the Supreme Court stated that "the specification ... of the prima facie proof required [in McDonnell Douglas] is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 253–54 & n. 6, 101 S.Ct. 1089.

94. *See Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1091 (5th Cir.1995) (no disparate treatment found) (citations omitted).

95. Docket no. 49, Andrade's Declaration, at ¶ 7.

drade does not dispute his acknowledgment that the polygraph test was a requirement of the application process and failure to pass it would result in withdrawal of his application. Significantly, there is no evidence that other similarly-situated non-Hispanic applicants, failed the polygraph test but were otherwise deemed suitable for consideration. In fact, some non-Hispanic applicants who failed the polygraph, such as William Sawers and Keith Benson, also filed suit against the City in state court.[96] Because passing a polygraph exam with non-deceptive answers was a requirement for all applicants, Andrade cannot argue that he should have somehow been exempted from the requirement. Accordingly, Andrade has failed to bring forth any evidence that would establish his second *prima facie* element that he was qualified for a beginning position with the S.A.F.D.

According to the pleadings in this case, Andrade brings a disparate treatment claim on the City's application of the "rule of three." The "rule of three" is applied by the Chief Executive (or City Manager, in San Antonio) once an applicant is deemed unsuitable for employment. Thus, as I understand the City's hiring process, any comparison of the qualifications of the applicant pool is not made at the Fire Chief's review level, but rather *after* the candidate is deemed unsuitable.

In this instance, Andrade was ranked # 87 in the eligibility list. In applying "the Rule of Three" to Andrade, the City considered those applicants who ranked below him, such as Donald Cummings (# 89), William Sawers (# 93), Aaron King (# 99), Michael Mumme (# 100), Jose Arredondo (# 101) Keith Benson (# 102) and Richard Jester (# 105).[97] Thus, Andrade's comparison to candidates Douglas Berry (# 37) and Eugene Webster (# 71) is immaterial since Andrade is not challenging his ranking in the eligibility list or that these two individuals' files were compared to his during any stage of the application process. The only material comparison Andrade makes is with Michael Mumme (# 100), who despite raking below him in the eligibility list was deemed suitable for employment pursuant to the "rule of three" comparison.

The summary judgment record shows that the City's background comparison of Mumme and Andrade elicited the following conclusions: Mumme had an "excellent" academic record, while Andrade had an "acceptable" one. In the area of previous work history, Mumme was viewed as having a "good" work history, while Andrade was viewed as having a "poor" one. In the driving record category, Mumme was deemed to have an "acceptable" record, while Andrade is described as having "misrepresented" his record. Also, the background investigation revealed that Andrade was arrested "for outstanding warrants" in 1990 while Mumme had no arrests on file. Both Andrade and Mumme admitted prior marijuana use, Mumme having last used it more recently (and frequently) than Andrade. Further, during the screening board interviews which consisted of a three-member panel, Mumme received two "strong" recommendations and one recommendation, while Andrade received two "marginal" recommendations and one recommendation. The summary judgment record also shows that Mumme passed the polygraph exam while Andrade did not.[98]

---

96. *Id.*, Andrade's Declaration, Exhibit 12.

97. Docket no. 49, Andrade's Declaration, Exhibit 14, at 2.

98. Docket no. 49, Andrade's Declaration, at ¶¶ 36, 38–39 & 46.

Even though Andrade disagrees with the characterization of his academic, past employment, driving and arrest records, and how prior marijuana use may have been held against him but not against Mumme, the record is undisputed, as described above, that Mumme's background was substantially different than that of Andrade. Based on a comparison between Mumme's and Andrade's qualifications and the summary judgment record, Andrade offers no evidence that the City's application of the "rule of three" and the appointment of Mumme over Andrade was somehow motivated by his national origin, but was rather based on the City's view that Mumme's overall background made him a more suitable candidate than Andrade.[99] Even by construing the facts in the light most favorable to Andrade, it is undisputed that Mumme's work history, arrest history (or lack thereof), screening board interviews and polygraph results, favored the City's decision to select him for employment.

Regarding the alleged statement made by the head of the application process, Lt. Hines, that there were too many Mexicans in the eligibility list, Andrade has failed to present any competent summary judgment evidence in support of the statement. The record reveals that Andrade first learned about the statement through an EEOC charge of discrimination filed by another applicant.[100] Based on the record, it is impossible to ascertain when was the statement made (*i.e.*, did it relate to the

eligibility list at issue in this case?), if any, and in what context was it made. It is undisputed, however, that the purported statement was not made in Andrade's presence, and because it is a statement that is used to prove the truth of the matter asserted, that is, that the City (assuming that Lt. Hines is an agent of the City) was biased against Mexicans and/or Hispanics, it constitutes inadmissible hearsay.

Even assuming *arguendo* that Andrade has met his *prima facie* case, the City has proffered legitimate non-discriminatory reasons for rejecting his application for a beginning firefighter position. Besides citing Andrade's failure to pass the non-deceptive polygraph exam, which was a requirement of all applicants seeking beginning positions, both Fire Chief Ojeda and City Manager Briseño reviewed Andrade's application file and determined, that based on his background, he was unsuitable for employment. Contrary to Andrade's assertions, the information relied upon by Ojeda and Briseño did not derive solely from the polygraph exam, but from Andrade's background investigation and overall application file.[101] Failing the polygraph exam was not the sole disqualifying factor in this case.

Andrade relies on the case of *Woodland v. City of Houston, et al.,*[102] in support of his argument that the polygraph exam is inadmissible as a matter of law and cannot be used to justify his termination. In *Woodland*, applicants for public safety po-

---

**99.** Further, although not dispositive or outcome-determinative, I note that Fire Chief Ojeda and City Manager Briseño are both of Hispanic national origin.

**100.** Docket no. 49, Andrade's Declaration, Exhibit 38.

**101.** Docket no. 49, Andrade's Declaration, Exhibits 4–6. This point is further buttressed by the form describing the "confidential"

qualification factors for firefighter applicants. *Id.* at Exhibit 37. That form states that "Failure to pass a non-deceptive polygraph exam *in conjunction with background investigation which supports polygraph findings may be grounds for rejection."* *Id.* at Exhibit 37, Section G(1).

**102.** 918 F.Supp. 1047 (S.D.Tex.1996).

sitions brought a class action against the city for injunctive relief and damages, challenging the city's use of pre-employment polygraph procedures as arbitrary and unreasonably intrusive. The district court entered final judgment and granted a permanent injunction enjoining the city from asking intrusive questions in its pre-employment polygraph screening, I find Andrade's reliance on *Woodland* misplaced.

As a preliminary matter, the *Woodland* opinion was vacated by the Fifth Circuit Court of Appeals and cannot serve as binding precedent.[103] Further, unlike in this case, the plaintiffs in *Woodland* brought an invasion of privacy claim against the City of Houston for the use of a polygraph as a pre-employment screening device. Even though Andrade has provided extensive briefing on his summary judgment response concerning the privacy considerations involved in the use of polygraphs, such a claim was not properly pleaded in his First Amended Complaint and this court declines to address it.[104]

Nevertheless, in reviewing the factual circumstances in *Woodland,* I find some significant differences from the case at hand. For example, the polygraph test in *Woodland* varied from applicant to applicant, the finding of deceptive responses was solely a decision of the polygraph examiner, and the applicant had no opportunity to show that the deceptive readings were false. In this case, there is no evidence that the polygraph questions varied from applicant to applicant. Importantly, Andrade was not only given an opportunity to explain the deceptive responses, but was also permitted to retake the exam to clear any deception. Finally, the questions at issue in this case (*i.e.*, thefts, undetected crimes and willful withholding of information during the application process) were job-related and relevant in determining whether a candidate is suitable for a beginning firefighter position. These questions were not only part of the polygraph exam, but were also part of the background investigation and personal history form. There is simply no evidence in the record that the decision by Fire Chief Ojeda and City Manager Briseño to terminate Andrade's employment was motivated by his national origin.

Because Andrade has failed to establish his *prima facie* case of national origin discrimination, namely, that he was qualified for a beginning position with the S.A.F.D. or that other similarly-situated applicants, not in Andrade's protected group, were treated any different than he was, the City's summary judgment motion on that claim is *granted.*

### 2. *Equal Protection Claim*

█ In pleading a claim under the Equal Protection Clause of the Fourteenth Amendment, Andrade simply restates his Title VII disparate treatment action.[105] Andrade's claims of intentional national origin discrimination in his termination may not also form the basis of a second, separate claim under Section 1983, unless the facts relied upon also establish a violation of some federal right independent of Title VII.[106] Since Andrade has not brought forth any evidence establishing a disparate treatment discharge claim on the basis of

---

**103.** 1996 WL 752803, No. 96–20358, (Aug. 21 1996).

**104.** Docket no. 31. Even Andrade's counsel conceded during oral argument that a privacy cause of action was not pleaded in the Complaint.

**105.** Docket no. 31, at 3.

**106.** *See Southard v. The Texas Board of Criminal Justice,* 114 F.3d 539, 548–49 (5th Cir. 1997).

his national origin, he has failed to establish a violation of a federal right independent of Title VII. Accordingly, the City's motion for summary judgment on Andrade's Equal Protection claim is likewise *granted.*

### 3. *Free Speech Retaliation Claim*

■ Andrade argues that the City's decision to terminate his employment was in retaliation for exercising his First Amendment right to free speech. The protected speech at issue is Andrade's state court lawsuit. Specifically, Andrade contends that his protected speech occurred while he was a citizen (an applicant, not yet admitted into the training academy) complaining about a matter of public concern, *i.e.*, the City's unlawful hiring practices.[107] The City has moved for summary judgment on this claim arguing that Andrade's state lawsuit was not a matter of public concern, but was rather a personal grievance, undeserving of any First Amendment protection. Contrary to the City's assertions, I find, based on the summary judgment evidence and applicable case authority, that Andrade has presented sufficient evidence to create a material issue of

disputed fact as to whether his state lawsuit constitutes a matter of public concern, precluding summary judgment on his First Amendment claim.[108]

It is well-established that a public employee may not be discharged for exercising his right to free speech under the First Amendment.[109] There are four elements to an employee's First Amendment claim against his employer: (1) the employee suffered an adverse employment decision; (2) the employee's speech involved a matter of public concern; (3) the employee's interest in commenting on matters of public concerns outweighs the defendants' interest in promoting efficiency; and (4) the employee's speech must have motivated the defendants' action.[110] As a threshold requirement to constitutional protection, the public employee must establish that his speech addressed a matter of public concern.[111] "If the speech does not concern a matter of public concern, a court will not scrutinize the reasons motivating a discharge that was allegedly in retaliation for that speech." [112]

The issue in this case is whether Andrade's state lawsuit, in which he com-

---

**107.** Docket no. 49, at 16.

**108.** Even though Andrade filed his lawsuit in state court as an applicant, not yet employed by the City, it is undisputed that the adverse actions for which he claims retaliation occurred after he became employed by the City as a firefighter trainee. Thus, for purposes of this Order *only*, I will assume, without ruling, that Andrade was an employee of the City and will proceed to analyze whether his speech involved matters of public concern.

**109.** *See Thompson v. City of Starkville*, 901 F.2d 456, 460 (5th Cir.1990) (citations omitted).

**110.** *Lukan v. North Forest ISD*, 183 F.3d 342, 345 (5th Cir.1999) (citing *Harris v. Victoria Ind. Sch. Dist.*, 168 F.3d 216, 220 (5th Cir. 1999)).

**111.** *See Connick v. Myers*, 461 U.S. 138, 146–47, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Kirkland v. Northside Ind. Sch. Dist.*, 890 F.2d 794, 797 (5th Cir.1989).

**112.** *Dodds v. Childers*, 933 F.2d 271, 273 (5th Cir.1991). *See also Connick*, 461 U.S. at 146, 103 S.Ct. 1684 (noting that if the speech at issue "cannot be fairly characterized as a matter of public concern, it is unnecessary for [courts] to scrutinize the reasons for [a public employee's] discharge."); *Davis v. Ector County*, 40 F.3d 777, 782 (5th Cir.1994) (Wisdom, J.) ("We note that, were we to find that the subject matter of Davis' letter is not a matter of public concern, our inquiry would end.").

plains of the City's purported illegal hiring practices and how those practices affected his application for employment (and that of others), is a matter of public concern. Speech rises to the level of public concern when an individual speaks primarily as a citizen rather than as an employee.[113] The analysis takes into consideration the totality of the circumstances surrounding the speech at issue:

> The existence of an element of personal interest on the part of an employee in the speech does not prevent finding that the speech as a whole raises issues of public concern. On the other hand, an employee cannot transform a personal conflict into an issue of public concern simply by arguing that individual concerns might have been of interest to the public under different circumstances.[114]

Despite such guidance, and because of the case-by-case analysis required, the definition of the term "public concern" is far from clear-cut.[115] Whether an employee's speech addresses a matter of public concern, rather than a matter of personal concern, must be determined by the content, form, and context of the given speech as revealed by the entire summary judgment record.[116]

To support his claim that his speech relates to matters of public concern, Andrade points out that the allegations made in his state court petition accused the City of engaging in a continuing pattern of unlawful hiring practices, in violation of statutory law. Specifically, Andrade pleaded in his state court lawsuit that the City through its agents, Fire Chief Ojeda and City Manager Briseño, made appointments for beginning firefighter positions by using "amorphous and subjective reasons [i.e., nepotism, favoritism] in contravention of Chapter 143 of the Local Government Code of the State of Texas" that persisted not only in the eligibility list at issue in his case but on previous eligibility lists.[117] A governmental entity's violation of a statute, Andrade argues, constitutes a matter of public concern. I agree.

Even though Andrade's state court lawsuit sought a temporary restraining order precluding the removal of his name from the eligibility list, allowing him to enter the training academy class pending resolution of the pending claims, he also petitioned a state court to find the City in violation of the law and order that it abide by the statutory scheme for the filling of beginning positions with the S.A.F.D.[118] I, thus, view the content of Andrade's speech as comprising of two parts: (1) his complaint that his name not be removed from the eligibility list, allowing him to continue with the application process; and (2) his complaint that the City and its officers committed numerous violations of the statutory scheme for the hiring of beginning firefighter positions that tainted not only his application process but that of applicants in prior eligibility lists. The latter part addresses far more than one applicant's dissatisfaction with the status quo or his own lot. In filing his state lawsuit, it was evident that Andrade sought to inform

---

113. See Thompson, 901 F.2d at 461.

114. Dodds, 933 F.2d at 273 (citations omitted). See also Connick, 461 U.S. at 149–50, 103 S.Ct. 1684.

115. See Thompson, 901 F.2d at 461 (citing Kirkland v. Northside Indep. School Dist., 890 F.2d 794, 798 (5th Cir.1989) ("The definition of 'matters of public concern' is imprecise.")).

116. Denton v. Morgan, 136 F.3d 1038, 1043 (5th Cir.1998).

117. Docket no. 49, Andrade's Declaration, Exhibit 12, at 4 & 6.

118. Id., Andrade's Declaration, Exhibit 12, at 11–12.

the public that the City was not discharging its governmental responsibilities, and if true, was committing actual wrongdoing, in its selection and hiring practices for filling beginning positions with the S.A.F.D. Thus, while his application for employment constitutes an integral part of his 1997 state court lawsuit, the second and broader-based component of his speech—seeking a court of law to order the City to abide by the statutory requirements in its hiring practices—cannot be ignored. Moreover, given the summary judgment posture of this case, it must be construed to the extent reasonable in Andrade's favor.[119]

Further, the Fifth Circuit has previously held, albeit under a different factual scenario, that "the disclosure of misbehavior by public officials is a matter of public interest and therefore deserves constitutional protection, especially when it concerns the operation of a police department."[120] Thus, the City's simplistic argument that the substance of Andrade's grievance concerns only personnel policy as it applied to him fails to address the totality of Andrade's speech.

Regarding context and form of the speech at issue, the City appears to assert that Andrade's state lawsuit fails to meet the public concern threshold requirement because it arose in the context of an employee grievance on a matter of personal

interest only, *i.e.*, that the City failed to follow hiring policies when it unjustly disqualified him from consideration for a beginning firefighter position. Contrary to the City's narrow view of Andrade's state lawsuit, I have determined that, Andrade's allegations of misconduct and violations of statutory law on the part of City officials in the hiring and selecting of firefighters, go beyond his personal interests. Courts have found that the existence of an element of personal interest on the part of an employee in his speech does not, however, dictate a finding that the employee's speech does not communicate on a matter of public concern.[121] Further, the Fifth Circuit has also recognized that an employee's speech may contain a mixture of public and personal concerns and still be entitled to First Amendment protection.[122]

In sum, my review of the entire summary judgment record leads me to conclude that the content, form and context of Andrade's alleged protected speech create genuine issues of material fact as to whether his expression addressed matters of public concern. Should his allegations prove true, a finding that his speech addressed issues of public concern would be merited. In arriving at this conclusion I have relied on *Thompson v. City of Starkville*,[123] a case factually and procedurally similar to the instant one. In *Thompson,* the Fifth Circuit affirmed the denial of

**119.** *See Rankin,* 483 U.S. at 384, 107 S.Ct. 2891 ("Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.").

**120.** *Brawner v. City of Richardson,* 855 F.2d 187, 191–92 (5th Cir.1988). *See also Conaway v. Smith,* 853 F.2d 789, 796 (10th Cir. 1988) (per curiam) ("Speech which discloses any evidence of corruption, impropriety, or other malfeasance on the part of city officials,

in terms of content, clearly concerns matters of public import.").

**121.** *Thompson,* 901 F.2d at 463 (citing *Connick,* 461 U.S. at 147, 103 S.Ct. 1684).

**122.** *Id.* at 464 (and discussion of case precedent). *See also Brawner,* 855 F.2d at 192 ("This circuit [the Fifth] has held that 'it is clear that only a portion of a communication need address a matter of public concern' ").

**123.** 901 F.2d 456 (5th Cir.1990).

summary judgment in favor of defendants finding that the record presented sufficient evidence to create a fact issue as to whether the plaintiff's/officer's oral and written complaints about allegedly unjust promotions and his assistance to other officers in filing grievances constituted a matter of public concern.[124]

Regarding the fourth element of causation, the City argues that the timing of the relevant events supports the conclusion that Andrade's termination had nothing to do with his purported protected speech. Specifically, the City contends that it terminated Andrade from employment for the same reasons it initially rejected his application in 1997. Because the initial rejection occurred prior to Andrade filing suit in state court, the City argues, Andrade will not be able to prove that his protected speech motivated his termination from employment. Because the timing in this case can also be interpreted in favor of Andrade, I disagree.

First, it is evident, that although Fire Chief Ojeda recommended that Andrade's name be removed from the eligibility list prior to Andrade filing suit in state court, the application of the "rule of three" by City Manager Briseño, on September 13, 1997, and his eventual termination from employment, on March 12, 1998, occurred *after* Andrade filed his state court lawsuit. In fact, City Manager Briseño, in his September 13, 1997 letter, expressly refers to Andrade's state court lawsuit by stating: "[f]or these good and sufficient reasons you were not considered to be the most suitable person for appointment. By virtue of the prior order of the Judicial District Court of Bexar County you will be placed in the next Firefighter Trainee Academy."[125] Further, at the time Chief Ojeda initially rejected Andrade's employment in 1997, the City was in violation of the statute since it was not the Fire Chief but the City Manager who had the authority to reject applicants.[126] It was not until the state court decision in the *Montemayor* suit, in 1998, that the Fire Chief was given the discretionary authority to terminate probationary employees such as firefighter trainees. At that point, both Fire Chief Ojeda and City Manager Briseño sent letters of termination to all state court litigants, including Andrade.[127]

Second, based on Andrade's declaration, it appears that those applicants who filed state court lawsuits were overtly singled out and constantly harassed while attending the training academy.[128] According to Andrade's sworn testimony, when giving a welcoming speech to the trainees comprising the 1997–B class, Fire Chief Ojeda made clear to everyone present that there were two kinds of cadets in the training academy: those who were there by court order due to a lawsuit and those he had chosen for the academy.[129] Not surprising, Andrade, as well as all the other state court litigants, were terminated from employment on March 12, 1998.[130]

In considering all facts and drawing all inferences in favor of Andrade, I conclude that Andrade has presented sufficient evidence to create material issues of disputed

---

124. *Id.* at 460–67.

125. Docket no. 49, Andrade's Declaration, Exhibit 14, at 2.

126. Docket no. 44, at 2.

127. Docket no. 49, Andrade's Declaration, Exhibits 31–32

128. *Id.* Andrade's Declaration, at ¶¶ 52–65.

129. *Id.* Andrade's Declaration, at ¶ 52.

130. *Id.* Andrade's Declaration, ¶¶ 64–65, Exhibits 31–32.

fact as to whether he engaged in protected speech when he filed his state lawsuit and whether that protected speech was a motivating factor in the City's decision to terminate his employment. Accordingly, the City's summary judgment motion on Andrade's First Amendment claim is *denied.*[131]

### A. *Qualified Immunity*

 ' Fire Chief Ojeda and City Manager Briseño, the individual defendants, also assert the defense of qualified immunity as an alternative ground for obtaining summary judgment.

Government officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.[132] The qualified immunity determination requires a two-step analysis. First, the court must determine whether the plaintiff has stated a violation of a right secured by the Constitution.[133] If the plaintiff crosses this threshold, the court next examines whether the right was clearly established at the time of the challenged conduct and whether the defendants' conduct was objectively reasonable.[134]

The inquiry in the instant case is whether, assuming Andrade's allegations to be true, Fire Chief Ojeda and City Manager Briseño violated Andrade's constitutional rights that were clearly established at the time of their actions. That is, whether the individual defendants would reasonably have known that their actions would violate Andrade's First Amendment right to free speech.

In 1997, Andrade filed his state lawsuit alleging that the City, and more specifically the individual defendants, violated state law by engaging in a continuing pattern of selecting applicants to beginning firefighter positions based on nepotism, favoritism, and other amorphous and subjective reasons. As a result of his state lawsuit, Andrade alleges that the individual defendants condoned a pattern of retaliation against him, as well as against all the other state court litigants who were attending the training academy by court order. For example, according to Andrade, the individual defendants participated in one or more of the following activities: making it clear that those who filed suit against the City (such as Andrade) were in the academy by court order and not because they were chosen by Fire Chief Ojeda; condoning the circulation of anonymous and non-anonymous letters throughout the Department expressing resentment and hostility towards all the state court litigants who filed suit against the City; and terminating Andrade's employment (as well as all other state court litigants), despite the fact he completed his training and his state certification requirements.[135]

As indicated earlier in this Order, I have concluded that Andrade has brought forth

---

**131.** Although it appears that the City has also moved for summary judgment by arguing that Andrade cannot establish that the individual defendants conspired to deprive him of his constitutional rights by retaliating against him, that argument is incomplete. Docket no. 44, at 23. Thus, I decline to rule on it for purposes of summary judgment. Any civil conspiracy claims brought by Andrade against the individual defendants within the context of his First Amendment claim will be tried.

**132.** *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

**133.** *See Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); and *Sanchez v.' Swyden,* 131 F.3d 1144, 1147 (5th Cir.1998).

**134.** *Sanchez,* 131 F.3d at 1147–48.

**135.** Docket no. 49, Andrade's Declaration, at ¶¶ 52–66 (and supporting Exhibits).

sufficient summary judgment evidence to create a fact issue as to whether his state lawsuit constitutes speech of public concern. The summary judgment record further supports the inference that Andrade's First Amendment rights were at stake in his termination. Moreover, at the time of Andrade's speech in 1997, it was well-settled that public employees could not be fired for exercising their First Amendment rights. In fact, the Fifth Circuit and the Supreme Court have "repeatedly reaffirmed the protection accorded to speech by a public employee speaking out on matters of public concern, especially where the employee's speech exposes improper conduct on the part of other public employees." [136] Thus, I conclude that if Andrade's allegations relating to the behavior of the individual defendants prove true, such retaliatory behavior is not of a nature that any reasonable official could possibly have thought legitimate.

Accordingly, because I have found that a factual dispute exists that precludes summary judgment on Andrade's First Amendment claim, "the trier of fact must determine the objective legal reasonableness of [the officials'] conduct by construing the facts in dispute." [137] For all these reasons, the individual defendants' alternative ground for summary judgment based on the defense of qualified immunity as it relates to Andrade's First Amendment claim, is *denied.*

i. *Official Capacity*

■ In addressing Andrade's claims against these individual defendants in their official capacities, it is well-established that a suit against a public official in his/her official capacity is, in reality, a suit against the governmental entity the official represents. [138] The individual defendants are employees of the City of San Antonio. Full relief, if warranted, can be afforded under 42 U.S.C. § 1983 against the City of San Antonio without naming individual employees in their official capacities. Accordingly, because I find that the claims against defendants Fire Chief Ojeda and City Manager Briseño in their official capacities are duplicitous of the claims brought against the City of San Antonio, I *grant* the City's summary judgment motion with respect to the claims brought against the individual defendants in their official capacities.

### 4. *Texas Constitutional Claims*

Andrade has also asserted that the City retaliated against him when it terminated him, in violation of the freedom of speech, freedom of association and due course of law provisions of the Texas Bill of Rights of the Texas Constitution. [139] The City has moved for summary judgment arguing that the Texas Constitution does not afford any greater rights or remedies than those offered under the United States Constitution. In that regard, the City notes that there is no cause of action for damages for constitutional violations under the Texas Constitution. Further, it argues that since Andrade cannot establish his First Amendment federal claim, the City is also entitled

---

**136.** *Thompson,* 901 F.2d at 470 (and cases cited therein) (district court's denial of qualified immunity to the individual defendants, as it related to the plaintiff's free speech retaliation claim, affirmed).

**137.** *Id.* at 470 (citing *Melear v. Spears,* 862 F.2d 1177, 1184 (5th Cir.1989)).

**138.** *Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991); *Kentucky v. Graham,* 473 U.S. 159, 165–66, 105 S.Ct. 3099, 87 L.Ed.2d 114, (1985).

**139.** Docket no. 31, at 4.

to summary judgment on Andrade's claims under the Texas Constitution.[140]

██ Because I have found that Andrade has presented sufficient evidence precluding summary judgment for the City on his First Amendment claim, I *deny* the City's motion with respect to Andrade's state constitutional claims of free speech and freedom of association. Regarding Andrade's due process claims, there is no evidence on record that Andrade, as a firefighter trainee/probationary employee, had any due process rights other than those given to him, or that he had any property rights on his employment with the City. Accordingly, the City's motion for summary judgment with respect to Andrade's due process claim is *granted.* Further, to the extent that Andrade claims any due process violations in the City's use of a polygraph exam as part of its application process, that claim was not asserted in his First Amended Complaint; and it is, thus, not properly before me.[141]

█ On the issue of relief sought, it is undisputed that Andrade seeks reinstatement for the alleged Texas Constitution violations and "other such declaratory and equitable relief as the Court deems reasonable and appropriate." [142] Although the Texas Supreme Court held in *City of Beaumont v. Bouillion*[143] that there is no implied right of action for monetary dam-

ages arising under the free speech provision of the Texas Constitution, suits for equitable remedies (such as reinstatement) for constitutional right violations are not precluded.[144] Thus, if Andrade can establish at trial that there were violations of the Texas Constitution, as he alleges in this case, he could be entitled to reinstatement, if appropriate, or to any other form of equitable relief.

### 5. Municipal/Governmental Liability Under 42 U.S.C. § 1983

█ The City has moved for summary judgment arguing that Andrade cannot raise a genuine issue of material fact as to whether his termination was the product of either a formal policy or a long-standing, widespread custom or practice attributable to the City.[145] Further, the City argues that because it has hired Andrade, albeit in a different capacity and in a different department, since his termination from employment with the S.A.F.D. it cannot be found in violation of § 1983. Based on the record before me, I disagree.

In order to recover a judgment against a local governmental entity under § 1983, a plaintiff must establish that he sustained a deprivation of constitutional or other federally-protected rights as a result of some official policy, practice, or custom of that

140. Docket no. 44, at 24.

141. *See* note 100, *supra.*

142. Docket no. 31, at 4.

143. 896 S.W.2d 143, 147 (Tex.1995).

144. *See also University of Texas System v. Courtney*, 946 S.W.2d 464, 469 (Tex.App.—Fort Worth 1997, n.w.h.) (*"Bouillion* does state that aggrieved persons can assert direct claims for equitable relief against governmental entities for violations of the provisions of the Texas Bill of Rights.") (Emphasis added); *Harris County v. Going*, 896 S.W.2d 305, 308–

09 (Tex.App.—Houston [1st Dist.] 1995, writ denied) (plaintiff's equitable remedy of reinstatement not precluded); and *City of Midland v. O'Bryant*, 18 S.W.3d 209 (Tex.2000) (although the Court declined to rule on whether reinstatement can be a remedy for violations of the Texas Constitution, it affirmed the court of appeals' decision, 949 S.W.2d 406 (Tex.App.—Austin 1997), to reverse and remand the reinstatement issue to the trial court).

145. Docket no. 44, at 27.

governmental entity.[146] Although occasionally referred to as if they were three distinct creatures, a local governmental entity's *official* "policies," "practices," and "customs" are really three different terms for those actions which sufficiently bear the imprimatur of a governmental entity's final policy-makers to justify holding the governmental entity responsible.[147] An official "policy" is most commonly defined as a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy making authority.[148] A municipal "policy" must be a "deliberate and conscious choice" by a municipal policy-maker.[149] Whereas, an official "custom" or "practice" is most commonly defined as a "persistent, widespread practice of municipal officials or employees," which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy; actual or constructive knowledge of such custom or practice must be attributable to the governing body of the municipality or to an official to whom that body has delegated policy-making authority.[150]

In *Monell v. Department of Social Services of the City of New York*,[151] the Supreme Court held that a governmental entity can be found liable under Section 1983 *only* if the entity itself causes the constitutional violation at issue.[152] *Respondeat superior* or vicarious liability is not a basis for recovery under Section 1983.[153] A municipality may not be held liable under § 1983 solely because it employs a tortfeasor.[154] It is only when the execution of the government's policy or custom inflicts the injury that the governmental entity may be held liable under § 1983.[155]

Two basic configurations can lead to a municipality's liability under Section 1983

146. *See Board of County Commissioners, Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403–04, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); and *Harris v. Victoria ISD*, 168 F.3d 216, 225 (5th Cir.), *cert. denied*, 528 U.S. 1022, 120 S.Ct. 533, 145 L.Ed.2d 413 (1999).

147. *See Board of County Commissioners, Bryan County, Oklahoma*, 520 U.S. at 404–05, 117 S.Ct. 1382 (holding that only *deliberate* conduct by a municipality which actually causes an injury is compensable under Section 1983).

148. *See Baltazor v. Holmes*, 162 F.3d 368, 377 (5th Cir.1998); and *Eugene*, 65 F.3d at 1304–05.

149. *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (plurality); *Gonzalez v. Ysleta ISD*, 996 F.2d 745, 752–60 (5th Cir.1993); *Colle v. Brazos County*, 981 F.2d at 245; and *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir.1992).

150. *See Holmes*, 162 F.3d at 377; and *Sharp v. City of Houston*, 164 F.3d 923, 930 (5th Cir.1999) (holding that evidence established a municipal custom within the police department of a "code of silence" regarding sexual harassment of female officers and of retaliation against female officers who complained about same).

151. 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

152. *Id.* at 690–91, 98 S.Ct. 2018.

153. *See Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 122, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992); *Monell*, 436 U.S. at 691–94, 98 S.Ct. 2018; and *Flores v. Cameron County, Texas*, 92 F.3d 258, 263 (5th Cir. 1996), (holding that county liability under § 1983 cannot rest on a theory of respondeat superior).

154. *Board of Commissioners, Bryan County, Oklahoma*, 520 U.S. at 403, 117 S.Ct. 1382.

155. *Id.*

for the acts of its officials: first, a municipality's final policy-makers are held effectively to have made policy or condoned the creation of a *custom* by knowingly ratifying the unconstitutional or illegal actions of subordinate officers or employees, and, second, the municipality may be held liable for the illegal or unconstitutional actions of its *final policy-makers* themselves as they engage in the setting of goals and the determination of how those goals will be achieved.[156] As to the first situation, i.e., liability based upon officially-sanctioned custom or practice, isolated instances of official misconduct by a governmental entity's non-policy-making employees are inadequate to prove knowledge and acquiescence by the entity's policy-makers[157]; however, sufficiently numerous prior incidents of official misconduct, for example, may tend to prove a custom and accession to that custom by municipal policy-makers.[158] To succeed, a Section 1983 claim against a municipal entity must be based on the implementation or execution of a policy or custom which was officially adopted by that entity's official policy-makers.[159]

The second configuration, *i.e.*, liability based upon the official actions of *final* policy-makers has been the subject of sev-

**156.** *See Turner v. Upton County, Texas*, 915 F.2d 133, 136 (5th Cir.1990), *cert. denied*, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (1991). As discussed at greater length below, a governmental entity's final policy-maker(s) in an area are those individuals with the authority to independently perform the joint tasks of (1) setting goals for the governmental entity in their area of responsibility and (2) selecting the methods by which the governmental entity attempts to achieve those goals.

**157.** *See Fraire v. City of Arlington*, 957 F.2d at 1278, (holding that a city's failure to discipline a police officer for an isolated incident involving the alleged use of excessive force to effect an arrest did not give rise to an inference that the city had an official policy authorizing or encouraging police misconduct); *Rodriguez v. Avita*, 871 F.2d 552, 554–55 (5th Cir.1989), *cert. denied*, 493 U.S. 854, 110 S.Ct. 156, 107 L.Ed.2d 114 (1989); *Palmer v. City of San Antonio*, 810 F.2d 514, 516 (5th Cir. 1987); *Bennett v. City of Slidell*, 728 F.2d 762, 768 n. 3 (5th Cir.1984), *cert. denied*, 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985): "Isolated violations are not the persistent, often repeated constant violations that constitute custom and policy."; *Languirand v. Hayden*, 717 F.2d 220, 227 (5th Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984), (holding that a Section 1983 plaintiff asserting police misconduct must allege a "pattern of similar incidents in which citizens were injured or endangered" by policy-consistent misconduct or that serious incompetence or misbehavior was general

or widespread throughout the police force); and *Berry v. McLemore*, 670 F.2d 30, 33 (5th Cir.1982), *overruled on other grounds, International Woodworkers of America v. Champion International Corporation*, 790 F.2d 1174, 1181 (5th Cir.1986).

**158.** *See Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d at 92–93, (holding that the City could be held liable for the numerous seizures by municipal police of video and other equipment from adult video arcades over a period of two years where the police consulted with the City Attorney's office, which approved same, *before* commencing the seizures and the seizures continued even after the City had requested a federal court to stay a lawsuit filed by arcade operators to permit the state courts to first address the state statute relied upon by the police for the seizures); *Matthias v. Bingley*, 906 F.2d at 1054, (holding that a city could be held liable for a persistent, widespread, and longstanding practice by the police chief of failing to provide adequate notice to the lawful owners of property lawfully-seized by the police of their right to re-claim same prior to disposition thereof by the police, where responsibility for disposing of such property had been delegated by the city to the police chief); and *McConney v. City of Houston*, 863 F.2d 1180, 1184 & n. 2 (5th Cir.1989).

**159.** *Doe v. Dallas I.S.D.*, 153 F.3d at 215–16; *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 532 (5th Cir.1996); and *Krueger v. Reimer*, 66 F.3d 75, 76 (5th Cir.1995).

eral Supreme Court decisions since *Monell*. In *City of Oklahoma v. Tuttle*,[160] a plurality of the Supreme Court held that proof of a single incident of unconstitutional activity is not sufficient to impose liability on the municipality, unless there is proof that it was caused by an existing, unconstitutional municipal policy, attributable to a final municipal policy-maker.[161] In *Pembaur v. City of Cincinnati*,[162] a somewhat divided group of six Supreme Court Justices agreed that municipal liability may, under appropriate circumstances, be imposed for a single decision by final municipal policy-makers.[163] One circumstance agreed upon by the Justices in *Pembaur* where such would be the case is that which occurs where a government decision-maker possessing *final* authority with respect to an area of government responsibility orders or directly participates in the action that causes the alleged violation of the plaintiff's rights.[164] Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and whether an official has final policy-making authority is a question of state law.[165] Identifying a *final* policy-maker requires examination of applicable state law regarding the legal authority possessed by local officials.[166]

**160.** 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

**161.** *See Tuttle*, 471 U.S. at 823–24, 105 S.Ct. 2427. That opinion garnered the support of only its author, then-Justice Rhenquist, and then-Chief Justice Burger, and Justices White and O'Connor. Justices Brennan, Marshall, and Blackmun, concurring in the judgment in *Tuttle*, specifically rejected the implication in the plurality's opinion that only *existing* municipal policies could form the basis for municipal liability where the acts of an official possessing *final* municipal policy-making authority were at issue. *Id.* at 831–32, 105 S.Ct. 2427.

**162.** 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

**163.** *See Pembaur*, 475 U.S. at 480–81, 106 S.Ct. 1292. The *Pembaur* plurality, *i.e.*, Justices Brennan, White, Marshall, and Blackmun, held that a municipality may be held liable under Section 1983 for a single decision by its properly constituted legislative body, regardless of whether that body had taken similar action in the past or intended to do so again in the future, because even a single decision by such a body unquestionably constitutes an act of official government policy. *Id.* at 480, 106 S.Ct. 1292. Justices Stevens and O'Connor, each writing separately, agreed with this portion of the plurality opinion. *Id.* at 491, 106 S.Ct. 1292. It is clear in this Circuit that a single unconstitutional act by a local governmental entity's final policy-maker can subject that governmental entity to liability under Section 1983. *See Bennett v. Pippin*, 74 F.3d at 586.

**164.** *See Pembaur*, 475 U.S. at 481, 106 S.Ct. 1292 ("If the decision to adopt that particular course of action is properly made by that government's authorized decision-makers, it surely represents an act of official government 'policy' as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.)" *Accord Brooks v. George County, Mississippi*, 84 F.3d at 165 (holding that a single decision by a final policy-maker within the area of his responsibility can impose liability on the responsible governmental entity).

**165.** *See McMillian v. Monroe County, Alabama*, 520 U.S. 781, 784–88, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997); *Pembaur*, 475 U.S. at 483, 106 S.Ct. 1292 (plurality); *Dallas I.S.D.*, 153 F.3d at 216–17; and *Flores*, 92 F.3d at 263. *See also Jett v. Dallas ISD*, 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); and *Gros v. City of Grand Prairie, Texas*, 181 F.3d at 617 (holding that determination as to whether an official has been delegated final policymaking authority is a question of law for the court, not one of fact for the jury).

**166.** *See McMillian*, 520 U.S. at 786–87, 117 S.Ct. 1734; *Gros*, 181 F.3d at 615–17 (holding that sources of state law identifying a final

Generally, *final* policy-makers include those local officials who, by virtue of state law, (1) hold virtually absolute sway over the particular tasks or areas of responsibility entrusted to them and (2) are accountable to no one other than the voters for their conduct in those areas.[167] *Final* policy-makers are usually empowered by state law to "define objectives and choose the means of achieving them" without supervision by any other governmental official.[168]

In addition to persons identifiable as final policy-makers under state law, the actions of officials who exercise final policy-making authority as a result of a formal delegation of that authority from a local governmental entity's governing body can also provide a basis for holding that governmental entity liable under Section 1983.[169] Only the actions of, or policies established by, those local governmental officials who exercise independent, *final*, decision-making authority can create a basis for holding a local governmental entity liable under § 1983.[170] Furthermore, where the act or omission of the final policy-maker personally did not directly cause the violation of a constitutional right, only decisions of the final municipal policy-maker which constitute a conscious disregard for a high risk of unconstitutional conduct by others can give rise to municipal liability.[171]

Moreover, municipal liability under Section 1983 attaches only when the official responsible for establishing final policy with respect to the subject matter in ques-

policymaker include not only positive state law but also custom or usage having the force of law); *Dallas I.S.D.*, 153 F.3d at 216; *Brady v. Fort Bend County*, 145 F.3d 691, 699–700 (5th Cir.1998), *cert. denied.* 525 U.S. 1105, 119 S.Ct. 873, 142 L.Ed.2d 774 (1999); *Esteves v. Brock*, 106 F.3d at 677–78, (holding that determination of whether an official was acting on behalf of the state or the local government is determined by state law); *Flores*, 92 F.3d at 263; *Bennett*, 74 F.3d at 586; and *Doe v. Rains County ISD*, 66 F.3d 1402, 1407 (5th Cir.1995).

**167.** *See Turner*, 915 F.2d at 136. The focus of inquiry is on the particular task or duty performed by the official and his or her authority to exercise final control over the performance of that task or duty. *See Brady v. Fort Bend County*, 145 F.3d at 699–700, (holding that a newly elected County Sheriff was responsible under applicable Texas law for the decision not to rehire Sheriff's deputies who had campaigned for the ousted incumbent).

**168.** *See Colle*, 981 F.2d at 244; *Turner*, 915 F.2d at 136; and *Rhode v. Denson*, 776 F.2d 107, 109 (5th Cir.1985), *cert. denied*, 476 U.S. 1170, 106 S.Ct. 2891, 90 L.Ed.2d 978 (1986).

**169.** *Pembaur*, 475 U.S. at 483, 106 S.Ct. 1292 (plurality); *Dallas I.S.D.*, 153 F.3d at 216 (holding that a local school district did not delegate final District policymaking authority over complaints of sexual misconduct by teachers against students to campus principals although the District had not adopted a formal policy addressing the manner in which such complaints should be handled); *Bingley*, 906 F.2d at 1054 (holding a city liable for the illegal actions of a city police chief in connection with the disposition of seized private property where the city had delegated responsibility for the property to the chief); and *Crowder v. Sinyard*, 884 F.2d 804, 829 (5th Cir.1989), *cert. denied*, 496 U.S. 924, 110 S.Ct. 2617, 110 L.Ed.2d 638 (1990) (holding that a jury's finding that a city had delegated its final policy-making authority in the area of law enforcement to a city police chief was supported by the evidence and warranted imposing liability upon the city).

**170.** *See Sanders v. English*, 950 F.2d 1152, 1159 n. 13 (5th Cir.1992) (holding that a city may be held liable on account of the unconstitutional conduct of city officials only if the city's policy or custom played a part in the violation); and *Burns v. City of Galveston*, 905 F.2d 100, 102–03 (5th Cir.1990) (holding that Section 1983 liability for a city can only be based on a deliberate choice to follow a course of action made by final policy-makers).

**171.** *See Board of Commissioners, Bryan County, Oklahoma*, 520 U.S. at 404–06, 117 S.Ct. 1382, and *Dallas I.S.D.*, 153 F.3d at 216–17.

tion, makes a deliberate choice to follow a course of action from among various alternatives.[172] Thus, mere negligence on the part of local governmental final policy-makers does not give rise to governmental liability under § 1983.[173]

In this case, it is undisputed that state law gives authority to Fire Chief Ojeda to appoint or terminate probationary employees such as firefighter trainees.[174] Also, Andrade has presented summary judgment evidence that the Fire Chief was in some part responsible for the approval of the qualification factors by which applicants for beginning firefighter positions with the S.A.F.D. were evaluated.[175] Further, under those guidelines, it is evident that Fire Chief Ojeda was the final authority in determining whether to reject an applicant for employment.[176] With respect to City Manager Briseño, state law also confers on him the authority to apply "the rule of three" to applicants who were disqualified from the process.[177] Both of these defendants sent letters of termination to Andrade on March 12, 1998.[178]

Based on my review of the applicable state law and the record in this case, I find that Andrade has presented sufficient evidence to create a fact issue as to whether the individual defendants acted as government decision-makers possessing final authority with respect to the hiring practices followed by the City for filling beginning firefighter positions. Accordingly, the City's request for summary judgment on Andrade's governmental liability claim under § 1983 is *denied.*

## VII. *Conclusion*

Based on the foregoing, the City's motion for summary judgment (docket no. 44) is **GRANTED, IN PART,** with respect to Andrade's causes of action under Title VII, the Equal Protection Clause of the Fourteenth Amendment, and due process claim under the Texas Constitution; and **DENIED, IN PART,** with respect to Andrade's claims for free speech retaliation claims under the First Amendment of the United States Constitution and the Texas Constitution (including a violation of the freedom to associate), and governmental liability under 42 U.S.C. § 1983. Defendants Ojeda's and Briseño's request for qualified immunity is **GRANTED** with respect to liability in their official capacities but **DENIED** with respect to liability in their individual capacities. By Separate Order, I will set those claims for which I have not granted summary judgment for trial.

**172.** *Board of Commissioners, Bryan County, Oklahoma,* 520 U.S. at 404–05, 117 S.Ct. 1382; and *Pembaur,* 475 U.S. at 483–84, 106 S.Ct. 1292 (plurality).

**173.** *See Dallas I.S.D.,* 153 F.3d at 215–17 (holding school district's failure to adopt an official policy addressing allegations of sexual assault by teachers on students could not support Section 1983 liability where that failure was merely an unintentional negligent oversight).

**174.** *Montemayor v. City of San Antonio,* 985 S.W.2d 549, 551 (Tex.App.—San Antonio 1998) (interpreting relevant provisions of the Act). *See* Factual and Procedural Background Section, *supra.*

**175.** Docket no. 49, Andrade's Declaration, Exhibit 37.

**176.** *Id.*

**177.** TEX.LOC GOV'T CODE ANN. § 143.026(c).

**178.** Docket no. 49, Andrade's Declaration, Exhibits 31 & 32.